IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| EL PASO PIPELINE GP COMPANY, L.L.C., | § | |
| | § | No. 103, 2016 |
| Defendant Below, | § | |
| Appellant/Cross-Appellee, | § | |
| | § | |
| and | § | Court Below: |
| | § | Court of Chancery of the |
| EL PASO CORPORATION, DOUGLAS L. | § | State of Delaware |
| FOSHEE, JOHN R. SULT, RONALD L. | § | |
| KUEHN, JR., D. MARK LELAND, ARTHUR | § | Consolidated C.A. No. 7141-VCL |
| C. REICHSTETTER, WILLIAM A. SMITH | § | |
| and JAMES C. YARDLEY, | § | |
| | § | |
| Defendants Below, | § | |
| Cross-Appellees, | § | |
| | § | |
| and | § | |
| | § | |
| EL PASO PIPELINE PARTNERS, L.P., | § | |
| | § | |
| Nominal Defendant Below, | § | |
| | § | |
| v. | § | |
| | § | |
| PETER R. BRINCKERHOFF, TRUSTEE OF | § | |
| THE PETER R. BRINCKERHOFF REV. TR. | § | |
| U/A DTD 10/17/97, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee/Cross-Appellant. | § | |

Submitted: October 19, 2016
Decided: December 20, 2016

Before **STRINE**, Chief Justice; **HOLLAND**, **VALIHURA** and **VAUGHN**, Justices; and
**RENNIE**, Judge,[*] constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **REVERSED**.

---

[*] Sitting by designation pursuant to Del. Const. Art. IV § 12 and Supreme Court Rules 2(a) and
4(a) to fill up the quorum as required.

Peter J. Walsh, Jr., Esquire, Brian C. Ralston, Esquire, and Berton W. Ashman, Jr., Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware. Bradley R. Aronstam, Esquire, S. Michael Sirkin, Esquire, Ross Aronstam & Moritz LLP of Wilmington, Delaware. Of Counsel: Joseph S. Allerhand, Esquire (*argued*), Seth Goodchild, Esquire, Amanda K. Pooler, Esquire, and Nikolei M. Kaplanov, Esquire, Weil, Gotshal & Manges LLP, New York, New York; Christine T. Di Guglielmo, Esquire, Weil, Gotshal & Manges LLP, Wilmington, Delaware, for Defendant Below, Appellant/Cross-Appellee *El Paso Pipeline GP Company, L.L.C.* and Defendants Below, Cross-Appellees *El Paso Corporation, Douglas L. Foshee, John R. Sult, Ronald L. Kuehn, Jr., D. Mark Leland, Arthur C. Reichstetter, William A. Smith,* and *James C. Yardley.*

Jessica Zeldin, Esquire, Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware. Of Counsel: Jeffrey H. Squire, Esquire (*argued*), Lawrence P. Eagel, Esquire, and David J. Stone, Esquire, Bragar Eagel & Squire, P.C., New York, New York, for Plaintiff Below, Appellee/Cross-Appellant *Peter R. Brinckerhoff, Trustee of the Peter R. Brinckerhoff Rev. Tr. U/A DTD 10/17/97.*


**VALIHURA**, Justice:

## I. INTRODUCTION

In a detailed, well-reasoned decision, the Court of Chancery held that a conflicts committee approved a conflict transaction that it did not believe was in the best interests of the limited partnership it was charged with protecting. In fact, the court found that the committee—and the committee's financial advisor in particular—knew the transaction was unduly favorable to the limited partnership's general partner. In its post-trial opinion, the Court of Chancery undertook a detailed analysis explaining why $171 million was a conservative estimate of the overpayment approved by the committee and used that figure as the basis for its damages award.

But the problem for the derivative plaintiff who won at trial is that, after the trial was completed and before any judicial ruling on the merits, the limited partnership was acquired in a merger. Under 6 *Del. C.* § 17-211(h)[1] and analogous judicial authority governing these situations,[2] the claims brought by the plaintiff on behalf of the limited partnership were transferred to the buyer in the merger. The plaintiff's standing was

---

[1] 6 *Del. C.* § 17-211(h) ("When any merger or consolidation shall have become effective under this section, for all purposes of the laws of the State of Delaware, *all of the rights, privileges and powers* of each of the domestic limited partnerships and other business entities that have merged or consolidated, and all property, real, personal and mixed, and all debts due to any of said domestic limited partnerships and other business entities, *as well as all other things and causes of action* belonging to each of such domestic limited partnerships and other business entities, shall be vested in the surviving or resulting domestic limited partnership or other business entity . . . ." (emphasis added)).

[2] *See, e.g.*, *Lewis v. Anderson*, 477 A.2d 1040, 1049 (Del. 1984) ("A plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit."); *Ark. Teacher Ret. Sys. v. Countrywide Fin. Corp.*, 75 A.3d 888, 894 (Del. 2013) (*en banc*) ("[T]he derivative claim—originally belonging to the acquired corporation—is transferred to and becomes an asset of the acquiring corporation as a matter of statutory law." (citations omitted)).

extinguished, and his only recourse was to challenge the fairness of the merger by alleging that the value of his claims was not reflected in the merger consideration.

The Court of Chancery, however, rejected the defendants' argument to this effect and issued a thoughtful opinion arguing that the derivative plaintiff's claims, although always treated by him as derivative before the merger was announced, could also be considered direct, or, even if derivative, should survive the merger for the core policy reason that dismissal would leave the unaffiliated limited partners without recompense for the general partner's prior unfair dealing.

In this troubling case, we reverse. We find that the derivative plaintiff's claims were and remain derivative in nature. That a limited partner is often, as is the case here, required to look to the entity's foundational agreement rather than to default principles of equity law for protection does not mean that every claim for breach of those foundational agreements is direct. Rather, to determine if a claim is derivative or direct requires the usual examination of who owns the claim.

Here, it is plain under the limited partnership agreement that the limited partnership itself was entitled in the first instance to sue and obtain recovery against the general partner and its co-defendants for any claim that the transaction was economically unfair to the limited partnership. That individual limited partners might press the limited partnership's rights as derivative plaintiffs does not make the claims ones belonging to them individually. In addition, the claims of the derivative plaintiff here were not dual in nature. We agree that some recent case law can be read as undercutting the traditional

4

rule that dilution claims are classically derivative.[3] We decline to further expand that case law in the limited partnership context, especially in a case like this when there was no plausible argument that the transaction had the effect of increasing the voting power or control of the general partner at the expense of the unaffiliated unitholders. From the start, the derivative plaintiff has sought only monetary relief for the limited partnership.

Likewise, we part company with the Court of Chancery on its determination that the merger did not extinguish the derivative claims. We understand an equity court's reluctance to countenance the possible extinguishment of claims when there is record evidence suggesting bad faith conduct by persons controlling the limited partnership and by a financial advisor, and when those persons knew that the public limited partners were relying on their good faith as their only protection from overreaching by the general partner. But, the question here is whether to change our settled law in a substantial way, a question that requires us to have confidence that the benefits of departure will outweigh the costs. In most situations, permitting pending derivative claims to survive a merger would be inefficient and overly costly for public investors. Useful transactions would be deterred or priced at a lower value because third-party acquirers would find themselves having bought into litigation morasses, the persistence of which they cannot control.

Under our law, equity holders confronted by a merger in which derivative claims will pass to the buyer have the right to challenge the merger itself as a breach of the

---

[3] *See, e.g.*, *Gentile v. Rossette*, 906 A.2d 91 (Del. 2006); *In re Tri-Star Pictures, Inc., Litig.*, 634 A.2d 319 (Del. 1993), *as corrected* (Dec. 8, 1993).

5

duties they are owed.[4]  In many cases, it might be difficult to allege that the value they are receiving in the merger is unfair simply as a result of the failure to consider value associated with their derivative suit.  But that reality may also suggest that, even according full value to the potential recovery in the derivative suit (rarely a guarantee), the plaintiffs still received fair value in the merger.  To make the general rule one where derivative plaintiffs can continue to sue after a merger would thus raise overall transaction costs and barriers to mergers, with obvious costs to public investors, with no gain substantial enough to compensate them.  Thus, we adhere to *Lewis v. Anderson*[5] and its progeny and reverse.  Along with the rest of the partnership's assets, ownership of the claim passed to the partnership's successor by operation of law in the merger.  The derivative plaintiff's recourse was to file a money damages challenge to the merger and prove that the failure to accord value to the limited partnership in the merger was somehow violative of his rights.

We conclude that the plaintiff lost standing to continue this derivative action when the merger closed—both as to the direct appeal and cross-appeal.  Because our holding terminates the litigation, we do not reach the other issues raised by the parties.

---

[4] *See Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1245 (Del. 1999) ("In order to state a direct claim with respect to a merger, a stockholder must challenge the validity of the merger itself, usually by charging the directors with breaches of fiduciary duty resulting in unfair dealing and/or unfair price." (citing *Lewis*, 477 A.2d at 1046 n.10; *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 352 (Del. 1988) (additional citation omitted))).

[5] 477 A.2d 1040 (Del. 1984).

## II.    BACKGROUND

El Paso Pipeline Partners, L.P. was a publicly traded Delaware master limited partnership based in Houston, Texas (the "Partnership").  The plaintiff, Peter R. Brinckerhoff ("Brinckerhoff"), is the Trustee of the Peter R. Brinckerhoff Rev. Tr. U/A DTD 10/17/97, which was a limited partner of the Partnership.  The Partnership's sole general partner was El Paso Pipeline GP Company, L.L.C., a Delaware limited liability company (the "General Partner") and subsidiary of El Paso Corporation, a publicly traded Delaware corporation (the "Parent").  The Parent indirectly owned 100% of the General Partner.  The General Partner in turn owned all of the Partnership's general partner interest, representing a 2% economic interest in the Partnership.  The Parent also owned, either through the General Partner or its affiliates, approximately 52% of the Partnership's outstanding common units plus all of its incentive distribution rights.  The Parent controlled the Partnership through the General Partner and through the individuals who managed the Partnership's operations, all of whom were Parent employees.

### A.    *The Dropdown Transactions and the First Kinder Morgan Merger*

This litigation involves two transactions in which ownership interests "dropped down" from the Parent to the Partnership (the "Dropdowns").  Dropdown transactions support the typical master limited partnership ("MLP") scheme, in which a corporation "sponsors" an MLP by contributing assets to the MLP, which then issues public securities to maximize the market value of those assets.  Over time, an MLP's sponsor sells additional assets to the MLP in transactions known as dropdowns.

7

The first dropdown at issue in this appeal (the "Spring Dropdown") involved the sale of 51% of the Parent's interests in Southern LNG Company, L.L.C. ("Southern LNG") and El Paso Elba Express Company, L.L.C. ("Elba Express"). Because of the conflict presented by the Parent's control of the Partnership, the General Partner formed a conflicts committee (the "Spring Committee") to seek special approval of the transaction pursuant to Section 7.9(a) of the Limited Partnership Agreement governing the Partnership (the "LPA"). The Spring Committee met five times, obtaining legal advice from Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") and valuation analyses from its financial advisor, Tudor, Pickering, Holt & Co. ("Tudor").

On March 24, 2010, the Spring Committee unanimously approved the Spring Dropdown as "fair and reasonable to the Partnership" and recommended that the General Partner consummate the transaction. That same day, the General Partner adopted the Spring Committee's recommendation. On March 25, 2010, the Partnership announced the Spring Dropdown, and the transaction closed shortly thereafter.

The second transaction involved the Parent's remaining 49% interests in Southern LNG and Elba Express and a 15% interest in Southern Natural Gas Company (the "Fall Dropdown"). On October 14, 2010, the General Partner reconstituted the conflicts committee to seek special approval of the Fall Dropdown (the "Fall Committee"). On November 12, 2010, the Fall Committee approved the Fall Dropdown. The Parent announced the transaction on November 15, 2010, and it closed shortly thereafter.

In August 2011, Kinder Morgan, Inc. ("Kinder Morgan") offered to acquire the Parent. Kinder Morgan and the Parent entered into a merger agreement on October 16,

8

2011, which closed on May 24, 2012. After the merger, the Parent was no longer a separately traded public company, though the Partnership continued to be publicly traded. Brinckerhoff's units in the Partnership were not affected.

### B. *Initial Proceedings in the Court of Chancery*

On December 22, 2011, Brinckerhoff filed a verified derivative complaint challenging the Spring Dropdown (the "Spring Complaint"), naming as defendants the Parent, the General Partner, and members of the General Partner's board of directors, including the members of the Spring Committee (the "Defendants"). Brinckerhoff, "derivatively on behalf of [the Partnership]," alleged breach of express and implied duties, aiding and abetting, tortious interference, and unjust enrichment. After a hearing on October 26, 2012, the trial court dismissed the unjust enrichment claim. On March 6, 2012, Brinckerhoff filed a verified derivative complaint against Defendants challenging the Fall Dropdown (the "Fall Complaint"). As with the Spring Complaint, Brinckerhoff brought suit "derivatively on behalf of [the Partnership]," alleging the same four claims.

The Court of Chancery consolidated the two actions on March 4, 2013. Following discovery, the parties filed cross-motions for summary judgment. On June 12, 2014, the court granted summary judgment in favor of all Defendants with respect to the Spring Dropdown and denied Brinckerhoff's cross-motion.[6] The court also granted in part and denied in part the Defendants' motion for summary judgment with respect to the Fall

---

[6] *In re El Paso Pipeline Partners, L.P. Derivative Litig.*, 2014 WL 2768782 (Del. Ch. June 12, 2014).

9

Dropdown.[7]  The only surviving claim was against the General Partner for breach of the LPA.[8]  The court ordered that the case proceed to trial on the remaining claims, and Brinckerhoff moved for a final order pursuant to Court of Chancery Rule 54(b) to appeal the dismissal of his implied covenant of good faith and fair dealing claims.

## C.     *The Second Kinder Morgan Merger Followed By Trial*

In July 2014, Kinder Morgan met with members of the General Partner's board of directors and offered to acquire the Partnership (the "Merger").  The General Partner formed a conflicts committee to consider the Merger (the "Merger Committee").  The Merger Committee was comprised of the same directors as the Spring and Fall Committees and advised by Akin Gump and Tudor.

The evening before voting to approve the Merger, the Merger Committee considered what impact Brinckerhoff's derivative litigation would have on the Merger. The Merger Committee assumed that the claim would be extinguished by the Merger and decided that its value was "not sufficiently material" to impact the merger consideration. On August 10, 2014, Kinder Morgan and the Partnership jointly announced the Merger. Brinckerhoff chose not to challenge the Merger in court.[9]

---

[7] *In re El Paso Pipeline Partners, L.P. Derivative Litig.*, 2014 WL 2641304 (Del. Ch. June 12, 2014) (ORDER).

[8] Although Brinckerhoff's secondary liability theories also survived summary judgment, Brinckerhoff failed to "devote meaningful effort to presenting" these claims in post-trial briefing, and the Court of Chancery deemed them waived.  *In re: El Paso Pipeline Partners, L.P. Derivative Litig.* (*Liability Op.*), 2015 WL 1815846, at *14 (Del. Ch. Apr. 20, 2015).

[9] Other unaffiliated unitholders in the Partnership challenged the Merger, specifically with regard to the Merger Committee's failure to consider the value of Brinckerhoff's derivative litigation. *See* Verified Class Action Compl. at 27 ¶ 87, *Edwards v. El Paso Pipeline Partners, L.P.*, No. 10160-VCL (Del. Ch. Sept. 23, 2014).  They voluntarily dismissed that suit.  *See* Stipulation &

Within days of the Merger's announcement, Brinckerhoff withdrew his Rule 54(b) motion and requested a prompt trial. The Defendants responded that Brinckerhoff's standing would be extinguished by the Merger, but requested that the court defer decision on the standing question. Instead, the Defendants asked the court to "set a trial date, if at all, cognizant of the reality that the claims may be extinguished by year-end."

At a hearing on September 9, 2014, Defendants reiterated that Brinckerhoff's standing would be extinguished by the Merger, but stated that the standing question was not "properly teed up." After noting that a November trial date was "consistent with [its] expectations" for scheduling, the court deferred decision on the standing question, suggesting that if Defendants were to win, resolution of the complex direct versus derivative issue would be obviated. At trial in November 2014, Brinckerhoff "focused on proving damages by showing that [the Partnership] overpaid in the Fall Dropdown[.]"[10] He did not introduce evidence of individual harm to himself or any other limited partner.

### D.    *Post-Trial Proceedings*

Shortly after trial, on November 26, 2014, the Merger closed after approval by holders of a majority of the Partnership's outstanding common units. On December 2, 2014, Defendants moved to dismiss Brinckerhoff's claims as moot on the grounds that the Merger had extinguished his ownership and that he therefore lacked derivative standing. Defendants sought to defer briefing on the motion, arguing that they did not

---

Order of Dismissal, *In re Kinder Morgan, Inc. Corporate Reorganization Litig.*, No. 10093-VCL (Del. Ch. Apr. 2, 2015).

[10] *In re El Paso Pipeline Partners, L.P. Derivative Litig.* (*Standing Op.*), 132 A.3d 67, 80 (Del. Ch. 2015).

11

believe it was necessary to brief the motion unless any party indicated an intent to notice an appeal following the court's post-trial ruling. The Court of Chancery did not respond to or rule on the Defendants' motion to dismiss at that time, and the parties proceeded with post-trial briefing during December 2014 and January 2015.

On April 20, 2015, the Court of Chancery issued a detailed opinion in which it held the General Partner liable for breach of the LPA (the "Liability Opinion").[11] In so holding, the court found that the Fall Committee "went through the motions" and "did not subjectively believe that approving the Fall Dropdown was in the best interests of the Partnership."[12] The court found the Partnership suffered $171 million in damages.

On December 2, 2015, the Court of Chancery denied Defendants' motion to dismiss (the "Standing Opinion"). The court held that, because the claim for breach of the LPA was not exclusively derivative, Brinckerhoff could enforce the liability award irrespective of the Merger. In so holding, the court formed two principal conclusions.

*First*, the court stated that if Delaware law required it to choose between an exclusively direct characterization and an exclusively derivative characterization, then the court's holding was that Brinckerhoff asserted a direct claim for breach of contract.[13] The court distinguished Brinckerhoff's claims from *Tooley*,[14] stating that, in its view,

---

[11] *Liability Op.*, 2015 WL 1815846, at *14.

[12] *Id.* at *16.

[13] *Standing Op.*, 132 A.3d at 95.

[14] *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004).

"*Tooley* does not apply to contract rights[,]"[15] and that limited partners can sue directly to enforce contractual constraints in the limited partnership agreement.[16]

*Second*, the Court of Chancery nevertheless applied *Tooley* and held that Brinckerhoff had asserted a "dual-natured" claim, allowing him to litigate the claim directly post-Merger. The trial court concluded that, even apart from the "contractual angle," the Fall Dropdown had inflicted injury on both the Partnership and the unaffiliated unitholders.

As to the first prong of *Tooley*—who suffered the alleged harm—the court acknowledged that the "most obvious consequence of the Fall Dropdown was the infliction of harm on the Partnership."[17] The court also found injury to the limited partners in the "reallocat[ion] [of] value from the unaffiliated limited partners to the General Partner[,]" which "injured all of the investors in the Partnership proportionately."[18] The court determined that "both" the Partnership and the limited partners were harmed by the General Partner's alleged breach. It distinguished between third-party and insider transfers where "[t]he insider gains at the expense of the other

---

[15] *Standing Op.*, 132 A.3d at 99.

[16] *Id.* at 95 (citing *Allen v. El Paso Pipeline GP Co., L.L.C.*, 90 A.3d 1097, 1109 (Del. Ch. 2014); *Brinckerhoff v. Tex. E. Prods. Pipeline Co.*, 986 A.2d 370, 383 (Del. Ch. 2010); *Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund, L.P.*, 829 A.2d 143, 151, 154 (Del. Ch. 2003); *In re Cencom Cable Income Partners, L.P. Litig.*, 2000 WL 130629, at *6 (Del. Ch. Jan. 27, 2000)).

[17] *Id.* at 104.

[18] *Id.*

13

investors."[19]   The court reasoned that, because the insider received benefits to the exclusion of the other investors, the other investors suffered a distinct injury.

As to *Tooley*'s second prong—who would receive the benefit of a recovery—the Court of Chancery stated that recovery by the limited partnership was the "most obvious" remedy.  However, the Court of Chancery decided that, because the Partnership and the limited partners were both harmed, "either" could recover for the alleged breach.  The court expressed concern that, absent a direct recovery, Brinckerhoff would have to "start all over again" to hold the General Partner accountable.  The court allowed a *pro rata* recovery by all unaffiliated limited partners, even though Brinckerhoff had litigated the claim derivatively from the beginning, no other limited partners were joined as plaintiffs, and no class had been certified.

### III.   ANALYSIS

#### A.   *Standing is a Threshold Issue*

"The concept of standing, in its procedural sense, refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or redress a grievance."[20] Accordingly, "[a]s a preliminary matter, a party must have standing to sue in order to invoke the jurisdiction of a Delaware court."[21]  Standing is therefore properly viewed as a threshold issue to "ensure that the litigation before the tribunal is a 'case or controversy'

---

[19] *Id.* at 105.

[20] *Schoon v. Smith*, 953 A.2d 196, 200 (Del. 2008) (*en banc*) (quoting *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991)) (internal quotation marks omitted).

[21] *Ala. By-Prods. Corp. v. Cede & Co.*, 657 A.2d 254, 264 (Del. 1995) (citing *Stuart Kingston*, 596 A.2d at 1382).

14

that is appropriate for the exercise of the court's judicial powers."[22]  Whether a party has standing is a question of law that is subject to *de novo* review.[23]

Derivative standing is a "creature of equity"[24] that was created to enable a court of equity to exercise jurisdiction over corporate claims asserted by stockholders "to prevent a complete failure of justice on behalf of the corporation."[25]  We have observed that "[a] change in the parties' standing may result from a myriad of subsequent legal or factual causes that occur while the litigation is in progress."[26]  For instance, in corporate derivative litigation, loss of a plaintiff's status as shareholder generally extinguishes the plaintiff's standing.[27]  Once standing is lost, the court lacks the power to adjudicate the matter,[28] and the action will be dismissed as moot unless an exception applies.[29] Accordingly, the question of derivative standing is "properly a threshold question that the [c]ourt may not avoid."[30]

---

[22] *Dover Historical Soc'y v. City of Dover Planning Comm'n*, 838 A.2d 1103, 1110 (Del. 2003).

[23] *Schoon*, 953 A.2d at 200 ("Because the Court of Chancery's decision on director standing implicates rulings of law, we review it *de novo*." (citation omitted)).

[24] *Id.* at 202 (quoting 13 *Fletcher Cyclopedia of the Law of Private Corporations* § 5940).

[25] *Id.* at 208 (footnote omitted).

[26] *Gen. Motors Corp. v. New Castle Cnty.*, 701 A.2d 819, 824 (Del. 1997) (citations omitted).

[27] *See Lewis*, 477 A.2d at 1049.

[28] *See Ala. By-Prods.*, 657 A.2d at 264 (citing *Stuart Kingston*, 596 A.2d at 1382); *Gerber v. EPE Holdings, LLC*, 2013 WL 209658, at *12 (Del. Ch. Jan. 18, 2013) ("If there is no standing, there is no justiciable substantive controversy." (citation omitted)).

[29] *See Gen. Motors*, 701 A.2d at 823 ("A proceeding may become moot in one of two ways:  if the legal issue in dispute is no longer amenable to a judicial resolution; or, if a party has been divested of standing.").

[30] *Gerber*, 2013 WL 209658, at *12.

**B.** *Under the Partnership Agreement, the Partnership Owned the Claim*

In the context of conflicted transactions involving master limited partnerships, many of the cases involve "Conflicts of Interest" provisions which may contain common features, but are often different in nuanced ways. Thus, the prevalence of entity-specific provisions in an area of law defined by expansive contractual freedom requires a nuanced analysis and renders deriving "general principles" a cautious enterprise.

The Court of Chancery has characterized Brinckerhoff's allegation as a breach of the LPA's conflicts-of-interest provision ("Section 7.9(a)").[31] Section 7.9(a) provides in relevant part:

> Unless otherwise expressly provided in this Agreement or any Group Member Agreement, whenever a potential conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership, any Group Member, any Partner or any Assignee, on the other, any resolution or course of action by the General Partner or its Affiliates in respect of such conflict of interest shall be permitted and deemed approved by all Partners, and shall not constitute a breach of this Agreement, of any Group Member Agreement, of any agreement contemplated herein or therein, or of any duty stated or implied by law or equity, if the resolution or course of action in respect of such conflict of interest is (i) approved by Special Approval, . . . . The General Partner shall be authorized but not required in connection with its resolution of such conflict of interest to seek Special Approval of such resolution, and the General Partner may also adopt a resolution or course of action that has not received Special Approval. If Special Approval is sought, then it shall be presumed that, in making its decision, the Conflicts Committee acted in good faith, . . . in any proceeding brought by any Limited Partner or Assignee or by or on behalf of such Limited Partner or Assignee or any other Limited Partner or Assignee or the Partnership challenging such

---

[31] *Standing Op.*, 132 A.3d at 97.

16

approval, the Person bringing or prosecuting such proceeding shall have the burden of overcoming such presumption. . . .[32]

Section 7.9(b) is also relevant and provides that "[w]henever the General Partner makes a determination or takes or declines to take any other action" in its capacity as General Partner, "then, unless another express standard is provided for in this Agreement, the General Partner . . . shall make such determination or take or decline to take such other action in good faith and shall not be subject to any other or different standards (including fiduciary standards imposed by this Agreement . . . or under the Delaware Act or any other law, rule or regulation or at equity."[33] Likewise, "[w]henever the Conflicts Committee makes a determination or takes or declines to take any other action, it shall make such determination or take or decline to take such other action in good faith and shall not be subject to any other or different standards (including fiduciary standards) imposed by this Agreement . . . ."[34] Importantly, Section 7.9(b) defines "good faith" as follows:

> In order for a determination or other action to be in "good faith" for purposes of this Agreement, the Person or Persons making such determination or taking or declining to take such other action must believe that the determination or other action is in the best interests of the Partnership.[35]

The Court of Chancery concluded that Section 7.9(a) "barred the General Partner from causing [the Partnership] to engage in any transaction that (i) involved a potential

---

[32] El Paso Pipeline Partners, L.P., First Amended and Restated Agreement of Limited Partnership at § 7.9(a), A922-23 [hereinafter *LPA*].

[33] *Id.* at § 7.9(b), A923.

[34] *Id.*

[35] *Id.*

conflict of interest and (ii) failed to comply with one of the four contractual paths."[36] In its view, if the General Partner failed to satisfy one of four "contractually specified routes" for handling a conflict of interest (*e.g.*, Special Approval) set forth in Section 7.9(a), "then the General Partner would breach the [LPA]."[37] Accordingly, the court concluded that Brinckerhoff's "claim that the General Partner proceeded with the Fall Dropdown without complying with [Section 7.9(a)] is thus a direct claim for breach of contract."[38] The court then relied on this Court's decision in *NAF Holdings*[39] to support its view that the *Tooley* test for distinguishing between direct and derivative claims "does not apply to contract rights."[40]

Although the Vice Chancellor's analysis of Section 7.9(a) and (b) presents interesting interpretive issues,[41] we need not address them here. Instead, we focus on the narrow question of whether the plaintiff had standing post-merger.

---

[36] *Standing Op.*, 132 A.3d at 97.

[37] *Id.* at 77.

[38] *Id.* at 97.

[39] *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175 (Del. 2015).

[40] *Standing Op.*, 132 A.3d at 99 (citing *NAF Holdings*, 118 A.3d at 179).

[41] *Cf. Allen v. Encore Energy Partners, L.P.*, 72 A.3d 93, 102 (Del. 2013) (*en banc*) (describing a nearly identical provision to that set forth in Section 7.9(a) as "establish[ing] four 'safe harbors' that the [d]efendants can use to discharge their contractual duty of good faith when confronted with a conflict of interest") (quoting *Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 364-65 (Del. 2013) (*en banc*)); *Norton*, 67 A.3d at 365 (rejecting an argument that failing to meet a similar procedure for addressing conflicts "automatically put [the general partner] in breach" of the limited partnership agreement" (footnote omitted)); *In re Kinder Morgan, Inc. Corporate Reorganization Litig.*, 2015 WL 4975270, at *6 (Del. Ch. Aug. 20, 2015) (applying *Norton* to determine that "the [g]eneral [p]artner is not obligated to comply with [a similar safe harbor provision]; it has the choice whether or not to do so"), *judgment entered sub nom. In re Kinder Morgan, Inc.*, 2015 WL 5032517 (Del. Ch. Aug. 24, 2015), *and aff'd sub nom. Haynes Family Trust v. Kinder Morgan G.P., Inc.*, 2016 WL 912184 (Del. Mar. 10, 2016).

The standing analysis centers on the LPA's contractual duty of good faith. In its Liability Opinion, the Court of Chancery observed that, "[i]n this case, Section 7.9(b) established a known duty: the Committee members had to form a subjective belief that the Fall Dropdown was in the best interests of the Partnership."[42] More specifically, to comport with Section 7.9(b), the General Partner and the Conflicts Committee had to "believe that [their] determination or other action [was] in the best interest *of the Partnership*."[43] Accordingly, the contractual duty of good faith was owed to the Partnership, not the individual limited partners.[44] But the source of the duty owed—the entity's constitutive agreement, *i.e.*, the LPA—does not alone answer the question as to whether Brinckerhoff's claim was derivative, direct, or both.[45]

The Court of Chancery read our discussion in *NAF Holdings* to suggest that *Tooley* does not apply where the alleged harm involves contract rights.[46] We believe the trial court reads *NAF Holdings* too broadly. In *NAF Holdings*, we held that "a suit by a

---

[42] *Liability Op.*, 2015 WL 1815846, at *16.

[43] LPA, *supra* note 32, at § 7.9(b), A923 (emphasis added).

[44] *See Kinder Morgan*, 2015 WL 4975270, at *8 ("[T]he members of the [c]ommittee did not have to believe that the MLP [m]erger was in the best interests of the limited partners. They rather had to believe in good faith that the MLP [m]erger was in the best interests of the [p]artnership."); *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 181 (Del. Ch. 2014) ("Rather than requiring the [c]onflicts [c]ommittee to reach a subjective belief that the Drop[d]own was in the best interests of [the partnership] and its limited partners, the LP [a]greement requires only that the [c]onflicts [c]ommittee believe subjectively that the Drop[d]own was in the best interests of [the partnership]."), *judgment entered*, (Del. Ch. July 8, 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015).

[45] Brinckerhoff reads Section 7.9(a)'s reference to "any proceeding brought by any Limited Partner" as creating a direct cause of action for limited partners. However, this reference is better viewed as addressing the manner in which a limited partner's own rights can be enforced—which importantly includes derivative claims challenging conflicted transactions.

[46] *Standing Op.*, 132 A.3d at 99.

19

party to a commercial contract to enforce its own contractual rights is not a derivative action under Delaware law."[47] We explained that:

> *Tooley* and its progeny do not, and were never intended to, subject commercial contract actions to a derivative suit requirement. That body of case law was intended to deal with a different subject: determining the line between direct actions for breach of fiduciary duty suits by stockholders and derivative actions for breach of fiduciary duty suits subject to the demand excusal rules set forth in § 327 of the Delaware General Corporation Law, Court of Chancery Rule 23.1, and related case law.[48]

In *NAF Holdings*, we rejected the defendant's contention that *Tooley* was "intended to be a general statement requiring all claims, whether based on a tort, contract, or statutory cause of action (*e.g.*, antitrust), to be brought derivatively whenever the corporation of which the plaintiff is a stockholder suffered the alleged harm."[49] Thus, in *NAF Holdings*, the *Tooley* analysis was not needed to determine whether the commercial-contract claim was direct or derivative. As we explained there, when a plaintiff asserts a claim based upon the plaintiff's own right, such as a claim for breach of a commercial contract, *Tooley* does not apply.

NAF Holdings does not support the proposition that *any* claim sounding in contract is direct by default, irrespective of *Tooley*. Nor does it mean that Brinckerhoff's status as a limited partner and party to the LPA enable him to litigate directly every claim arising from the LPA. Such a rule would essentially abrogate *Tooley* with respect to

---

[47] *NAF Holdings*, 118 A.3d at 182.

[48] *Id.* at 179 (footnotes omitted).

[49] *Id.* at 180.

20

alternative entities merely because they are creatures of contract.[50] Limited partnerships are governed by their partnership agreements and by the Delaware Revised Uniform Limited Partnership Act (the "DRULPA"). The partnership agreement sets forth the rights and duties owed by the partners. The trial court treated the governing instrument of the Partnership as if it were a separate commercial contract, rather than it being the constitutive contract of the Partnership under the DRULPA itself. The reality that limited partnership agreements often govern the territory that in corporate law is covered by equitable principles of fiduciary duties does not make all provisions of a limited partnership agreement enforceable by a direct claim.

Because Brinckerhoff's claim sounds in breach of a contractual duty owed to the Partnership, we employ the two-pronged *Tooley*[51] analysis to determine whether the claim "to enforce the [Partnership's] own rights must be asserted derivatively"[52] or is dual in nature such that it can proceed directly.[53] We have observed that "[t]he *Tooley* direct/derivative test is 'substantially the same' for claims involving limited partnerships."[54] While the test may be substantially the same, cases involving limited partnerships often present unique facts relating to the provisions and structure of the

---

[50] *See Norton*, 67 A.3d at 360 ("Limited partnership agreements are a type of contract.").

[51] 845 A.2d at 1033.

[52] *Citigroup Inc. v. AHW Inv. P'ship*, 140 A.3d 1125, 1127 (Del. 2016).

[53] *See Loral Space & Commc'ns, Inc. v. Highland Crusader Offshore Partners, L.P.* (*Loral Space II*), 977 A.2d 867, 868 (Del. 2009) (stating that "[b]oth [direct and derivative] claims may be litigated" where a claim is dual-natured).

[54] *Culverhouse v. Paulson & Co.*, 133 A.3d 195, 198 n.9 (Del. 2016) (quoting *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 293 n.40 (Del. 1999)) (citations omitted).

21

limited partnership agreement and how it defines the rights and responsibilities of the limited partners.[55]

Under *Tooley*, whether a claim is solely derivative or may continue as a dual-natured claim "must turn *solely* on the following questions:  (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[56]  In addition, to prove that a claim is direct, a plaintiff "must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation."[57]

Applying the first prong of *Tooley*, the harm alleged in Brinckerhoff's complaint solely affected the Partnership.  The Fall Complaint alleged injury to Brinckerhoff only in terms of the alleged harm to the Partnership.[58]  The "core theory" of Brinckerhoff's complaint "was that 'the Partnership was injured' when the defendants caused [the

---

[55] *Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304, 306 n.3 (Del. 2015) ("[I]n cases involving [alternative] entities, distinctive arguments often arise due to the greater contractual flexibility given to those entities under our statutory law."); *see Haynes Family Trust*, 2016 WL 912184, at *1 (rejecting limited partnership unitholders' "contention that they ought to be able to litigate this case as if they were investors in a corporation").

[56] *Tooley*, 845 A.2d at 1033 (emphasis in original).

[57] *Id.* at 1039.  "The party invoking the jurisdiction of a court bears the burden of establishing the elements of standing."  *Dover Historical Soc'y*, 838 A.2d at 1109 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

[58] *See* Verified Derivative Compl. at A118 ¶ 6, *Brinckerhoff v. El Paso Pipeline GP Co.*, No. 7141-VCL (Del. Ch. Mar. 5, 2012) (alleging that the Fall Dropdown benefited the Parent "at the expense of [the Partnership], including at the expense of [Brinckerhoff] and the other nonaffiliated limited partners"); *id.* at A144 ¶ 100 (alleging that the Fall Dropdown's terms "were not fair and reasonable to [the Partnership]"); *id.* at A145 ¶ 102 (seeking damages "on behalf of [the Partnership]"); *id.* at A147 (requesting that the court order the "defendants to account to" the Partnership).

22

Partnership] to pay too much" in the Fall Dropdown.[59]  Such claims of corporate overpayment are normally treated as causing harm solely to the corporation and, thus, are regarded as derivative.[60]  In *Tooley* terms, the harm is to the corporation, because such claims "naturally assert that the corporation's funds have been wrongfully depleted, which, though harming the corporation directly, harms the stockholders only derivatively so far as their stock loses value."[61]  The recovery—"restoration of the improperly reduced value"—flows to the corporation.[62]

At trial, Brinckerhoff sought to prove "how [the Partnership] was harmed[,]" and he presented evidence of harm *only* as to the Partnership, not to the individual unitholders.[63]  The Defendants, at trial, were required to respond to the proof presented.

---

[59] *Standing Op.*, 132 A.3d at 78 (quoting Verified Derivative Compl., *supra* note 58, at A119 ¶ 8).  *See also* Pre-Trial Stipulation & Order at A529, *In re El Paso Pipeline Partners, L.P. Derivative Litig.*, C.A. No. 7141-VCL (Nov. 10, 2014) (contending that the Partnership "paid [the Parent] an unfairly high price" in the Fall Dropdown); *see also* Verified Derivative Compl., *supra* note 58, at A144 ¶ 100 (alleging that "the terms of the [Fall Dropdown] were not fair and reasonable to [the Partnership]" because the General Partner caused the Partnership to pay "hundreds of millions of dollars more than the value of those assets").

[60] *Gentile*, 906 A.2d at 99; *see also Caspian Select Credit Master Fund Ltd. v. Gohl*, 2015 WL 5718592, at *5 (Del. Ch. Sept. 28, 2015) (noting the general rule that "claims of corporate overpayment are derivative").

[61] *Protas v. Cavanagh*, 2012 WL 1580969, at *6 (Del. Ch. May 4, 2012) (citing *Gentile*, 906 A.2d at 99).

[62] *Gentile*, 906 A.2d at 99.

[63] *Standing Op.*, 132 A.3d at 80 ("Brinckerhoff focused on proving damages by showing that [the Partnership] overpaid in the Fall Dropdown, and the General Partner sought to rebut that theory. The parties did not present evidence at trial regarding specific harm to the unaffiliated limited partners."); *see Liability Op.*, 2015 WL 1815846, at *25 (stating that Brinckerhoff argued in support of damages that, due to the General Partner's breach of the LPA, the Partnership paid too much in the Fall Dropdown); *id.* at *26-27 (discussing Brinckerhoff's trial expert, who presented a calculation of the overpayment that occurred in the Fall Dropdown at the Partnership level); *see also* A653 (Tr. 289:17-24) (testimony of Brinckerhoff's damages expert agreeing that his opinion was "limited to a determination of whether the purchase price paid by [the Partnership]

23

Based on the evidence presented at trial, the Court of Chancery found that the alleged overpayment "left the *Partnership* $171 million poorer."[64] Any economic harm to Brinckerhoff devolved upon him as an equity holder in the form of the proportionally reduced value of his units—a classically derivative injury. "Where all of a corporation's stockholders are harmed and would recover *pro rata* in proportion with their ownership of the corporation's stock solely because they are stockholders, then the claim is derivative in nature."[65]

The Court of Chancery's analysis in *Gerber v. EPE Holdings, LLC*[66] is persuasive. In *Gerber*, the Court of Chancery considered a limited partner's claim that an MLP's general partner caused the partnership to purchase an asset for hundreds of millions of dollars more than its fair value. The limited partnership agreement provided a mechanism for resolving conflicts using a safe harbor provision.[67] Following a merger, the defendants challenged the plaintiff's standing. The Court of Chancery, applying *Tooley*, held that the plaintiff's claims were derivative, reasoning that the plaintiff had

---

was fair and reasonable to the [P]artnership and no less favorable to the [P]artnership than those generally being provided to or available from unrelated third parties").

[64] *Standing Op.*, 132 A.3d at 104 (emphasis added).

[65] *Feldman v. Cutaia (Feldman II),* 951 A.2d. 727, 733 (Del. 2008) (citing *Gentile*, 906 A.2d at 99).

[66] 2013 WL 209658 (Del. Ch. Jan. 18, 2013).

[67] *Id.* at *2 ("A conflict of interest between the [g]eneral [p]artner and the limited partners 'shall be permitted and deemed approved by all [p]artners, and shall not constitute a breach of [the LPA] . . . , or of any duty stated or implied by law or equity, if the resolution or course of action in respect of such conflict of interest is (i) approved by [s]pecial [a]pproval.'" (alteration in original and added)).

"not identified any independent harm suffered by the limited partners. Instead, [the MLP] suffered all the harm at issue—it paid too much."[68]

Notably, the court in *Gerber* declined to distinguish *Tooley* based on the contractual aspect of the plaintiff's claims, reasoning that, "unless *Tooley* does not apply to limited partnerships, it is difficult to see how [the plaintiff's] claims are anything other than derivative."[69] It observed that "[i]f the contractual rights of the limited partners are 'independent' of the partnership's rights, then the claims will be considered direct."[70] However, the court saw "no separation" between the plaintiff's claim and a claim belonging to the MLP, noting that the effect of the MLP's payment of too much was "immediately and discretely upon" the MLP.[71] Thus, the claim was derivative.

Like the plaintiff in *Gerber*, Brinckerhoff asserts an overpayment claim. The alleged overpayment resulted in immediate harm to the Partnership—a reduction in the Partnership's overall value. Here the contract right asserted was not separate and distinct from the rights of the entity. The "best interests of the Partnership" standard provided "no separation" between the Partnership's contractual rights and any rights of the limited partners.

In unique circumstances, this Court has recognized that some claims can be dual-natured—that is, both direct and derivative.[72] Again, we caution that simply because

---

[68] *Id.* at *12.

[69] *Id.*

[70] *Id.* (quoting *Anglo Am.*, 829 A.2d at 150).

[71] *Id.*

[72] *See, e.g.*, *Gentile*, 906 A.2d at 99.

25

limited partners are parties to the LPA, and duties and rights could potentially flow to either the limited partners or the Partnership, does not mean that every breach of any provision of the LPA is "dual."

Here, the Court of Chancery noted that "the decisions in which the Delaware Supreme Court has recognized dual-natured claims have been controversial and stand in tension with other decisions that have characterized similar claims as purely derivative."[73] It identified this Court's decision in *Gentile* as one such case. In *Gentile*, a corporation's CEO and controlling stockholder forgave a portion of the company's $3 million debt to him in exchange for additional equity. The applicable contractual conversion rate was $0.50 of debt per share, but the CEO and the company's board of directors (which included himself and one other person) agreed to $0.05 of debt per share. Without disclosing the underlying transaction, the board secured a stockholder vote authorizing the shares needed to issue the additional equity. The share issuance increased the CEO's equity position from 61.19% to 93.49%, thereby decreasing the minority stockholders' interest from 38.81% to 6.51%. When the CEO later negotiated a merger between the corporation and its only competitor, the CEO received a generous put agreement that was not disclosed to other stockholders. The trial court dismissed the ensuing stockholder litigation after determining that the claims were exclusively derivative and that the plaintiff stockholders lost standing after the merger.

On appeal, this Court recognized two independent aspects of the plaintiffs' complaint—the overpayment claim *and* the minority's significant loss of cash value and

---

[73] *Standing Op.*, 132 A.3d at 82 (footnote omitted).

voting power. These claims constituted "a species of corporate overpayment claim" that is "both derivative and direct in character."[74] This Court concluded that "[u]nlike the typical 'overpayment' transaction,"[75] a dual-natured claim "arises where:    (i) a stockholder having majority or effective control causes the corporation to issue 'excessive' shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling shareholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders."[76]    This Court reversed, allowing the plaintiffs to proceed with direct claims.

*Gentile* concerned a controlling shareholder and transactions that resulted in an improper transfer of both economic value *and* voting power from the minority

---

[74] *Gentile*, 906 A.2d at 99; *see also Gatz v. Ponsoldt*, 925 A.2d 1265, 1280-81 (Del. 2007).

[75] *Gentile*, 906 A.2d at 100 n.21.

[76] *Id.* at 100.  In *Feldman II*, this Court reiterated that "dilution claims are 'not normally regarded as direct, because any dilution in value of the corporation's stock is merely the unavoidable result (from an accounting standpoint) of the reduction of the value of the entire corporate entity, of which each share of equity represents an equal fraction.'" *Feldman II*, 951 A.2d at 732 (quoting *Gentile*, 906 A.2d at 99).  We commented further that "[i]n order to state a direct claim, the plaintiff must have suffered some individualized harm not suffered by all of the stockholders at large." *Id.* at 733 (citing *Gentile*, 906 A.2d at 99) (citation omitted).  We decline to extend *Gentile* further to say that a direct claim arises wherever a controlling stockholder extracts economic value from an entity to its benefit and to the detriment of the minority stockholders. Any broader interpretation would swallow the general rule that equity dilution claims are derivative. *See Feldman v. Cutaia*, 956 A.2d 644, 657 (Del. Ch. 2007) (seeking to avoid an interpretation of *Gentile* that "would swallow the general rule that equity dilution claims are solely derivative"), *aff'd Feldman II*, 951 A.2d 727.   Here, the Partnership was already controlled by the General Partner, and there is no suggestion that the transaction increased the General Partner's or Parent's control at the expense of the limited partners, or that the transaction affected the limited partners' voting rights in any way.

27

stockholders to the controlling stockholder.[77]  Brinckheroff's claim does not satisfy the

unique circumstances presented by the *Gentile* "species of corporate overpayment

claim[s][.]"[78]  Brinckerhoff never alleged and did not prove that the Partnership's

overpayment increased the General Partner's or the Parent's control at the expense of the

limited partners.  Brinckerhoff argues that, when the Partnership overpaid for the assets

involved in the Fall Dropdown, the Parent was enriched at the expense of the unaffiliated

unitholders.  He contends that this "expropriation" constituted a *direct* injury to the

unaffiliated limited partners.

Although Brinckerhoff concedes that this expropriation of economic value to a

controller was not coupled with any voting rights dilution, he argues that this distinction

is "immaterial."  We decline the invitation to further expand the universe of claims that

can be asserted "dually" to hold here that the extraction of solely economic value from

the minority by a controlling stockholder constitutes direct injury.  To do so would

deviate from the *Tooley* framework and "largely swallow the rule that claims of corporate

---

[77] *Gentile*, 906 A.2d at 100 ("[T]he end result of this type of transaction is an improper transfer—or expropriation—of economic value *and voting power* from the public shareholders to the majority or controlling stockholder." (emphasis added)); *id.* (noting that "a separate harm" results, namely, an "extraction from the public shareholders, and a redistribution to the controlling shareholder of a portion of the economic value *and voting power* embodied in the minority interest" (emphasis added); *see also Gatz*, 925 A.2d at 1280-81 (determining that a claim was dual in nature where "the fiduciary exercise[d] its stock control to expropriate, for its benefit, economic value and voting power from the public shareholders"); *Feldman II*, 951 A.2d at 732 n.26 (noting that "*Gentile* and *Gatz* both involved situations with a controlling shareholder and transactions that resulted in an improper transfer of both economic value and voting power from the minority stockholders to the controlling stockholder").

[78] *Gentile*, 906 A.2d at 99.

overpayment are derivative" by permitting stockholders to "maintain a suit directly whenever the corporation transacts with a controller on allegedly unfair terms."[79]

As to the second prong of *Tooley*, the benefit of any recovery must flow solely to the Partnership. The Court of Chancery recognized that "returning the full amount [of the overpayment] to the entity" was the "most obvious" remedy,[80] and that Brinkerhoff sought to recover damages "on behalf of" the Partnership.[81] Were Brinckerhoff to recover directly for the alleged decrease in the value of the Partnership's assets, the damages would be proportionate to his ownership interest. The necessity of a *pro rata* recovery to remedy the alleged harm indicates that his claim is derivative.[82]

In deviating from an entity-level remedy, the Court of Chancery relied on cases involving "insider transfers" of stock and "stock dilution cases[,]" which it read to permit remedies "at the stockholder level, without any payment to the corporation, such as an order adjusting the rights of the stock or invalidating a portion of the shares."[83] As discussed above, these cases are inapposite, as Brinckerhoff does not claim that the Fall Dropdown affected his voting rights or the Parent's relative control of the Partnership.[84]

---

[79] *Gohl*, 2015 WL 5718592, at *5 (citing *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 55-56 (Del. Ch. 2015)).

[80] *Standing Op.*, 132 A.3d at 111.

[81] Verified Derivative Compl., *supra* note 58, at A145 ¶ 102.

[82] *See Feldman II*, 951 A.2d at 733 (citing *Gentile*, 906 A.2d at 99)).

[83] *Standing Op.*, 132 A.3d at 111-12 (citing *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 656-57 (Del. Ch. 2013); *In re Loral Space & Commc'ns Inc.* (*Loral Space I*), 2008 WL 4293781, at *32 (Del. Ch. Sept. 19, 2008), *aff'd Loral Space II*, 977 A.2d 867; *Linton v. Everett*, 1997 WL 441189, at *7 (Del. Ch. July 31, 1997)).

[84] *Cf. Loral Space I*, 2008 WL 4293781, at *32 (after agreeing with minority shareholders in a derivative action that a controlling stockholder locked up majority ownership of the company in

Finally, Brinckerhoff never presented evidence at trial of specific harm suffered by the limited partners, as the Court of Chancery stated. It follows that the General Partner should not be penalized for failing to defend at trial an element of a claim (*e.g.*, that the unitholders were directly harmed by the Fall Dropdown) that the plaintiff never attempted to prove.[85]

Thus, Brinckerhoff's overpayment claim is exclusively derivative under *Tooley*.

### C. *The Merger Extinguished Brinckerhoff's Claim*

In *Lewis v. Anderson*,[86] this Court set forth the continuous ownership requirement.[87] We held that "[a] plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit."[88] This rule flows from the fact that, following a merger, "the derivative claim—originally belonging to the acquired corporation—is transferred to and becomes an asset of the acquiring corporation as a matter of statutory law."[89]

---

an unfair, conflicted stock purchase transaction, reforming the agreement to convert the controller's new shares into nonvoting common stock, thereby preserving its previous degree of voting power); *Linton*, 1997 WL 441189, at *7 (invalidating stock issuance after the court determined director defendants did not establish that the transaction was entirely fair).

[85] *See Standing Op.*, 132 A.3d at 80 (stating that "[t]he parties did not present evidence at trial regarding specific harm to the unaffiliated limited partners").

[86] 477 A.2d 1040 (Del. 1984).

[87] *Id.* at 1049. The statutory foundation for the continuous ownership requirement in the corporate realm is echoed in the limited partnership context. *Compare* 8 *Del. C.* § 259, *with* 6 *Del. C.* § 17-211(h).

[88] *Lewis*, 477 A.2d at 1049.

[89] *Ark. Teacher*, 75 A.3d at 894 (citing *Lewis*, 477 A.2d at 1049-50; 8 *Del. C.* § 259 (2013)).

Here, Brinckerhoff's claims were an asset of the Partnership. The claims passed by operation of law to Kinder Morgan as a result of the Merger. The Merger therefore extinguished Brinckerhoff's standing to assert these claims. Brinckerhoff's remedy was to challenge the Merger, but he elected not to do so.

### D.   *The Cross-Appeal*

Given our holding that Brinckerhoff lacks standing as to the Fall Dropdown, the same reasoning applies to his claims challenging the Spring Dropdown—the subject of his cross-appeal. We therefore dismiss Brinckerhoff's cross appeal.

### IV.   CONCLUSION

For the reasons set forth above, we reverse the Court of Chancery's decision that Brinckerhoff had standing to continue his claims following the Merger. We do not reach Brinckerhoff's cross-appeal, which is mooted by his lack of standing.

**STRINE**, Chief Justice, concurring:

I join fully in the majority's well-reasoned opinion. I write separately just to highlight a reality that this case exemplifies. *Gentile v. Rossette*[1] is a confusing decision, which muddies the clarity of our law in an important context. As the majority opinion makes clear, a claim that an entity has issued equity in exchange for inadequate consideration—a so-called dilution claim—is a quintessential example of a derivative claim.[2] But, *Gentile* purported to recognize a direct dilution claim when additional equity was issued to a company's CEO who was *already* the controlling stockholder.[3] The reasoning was that this diminution in the voting power of minority stockholders somehow gave rise to a direct injury even though they were already stockholders in a controlled company.

But, that decision is difficult to reconcile with traditional doctrine. All dilution claims involve, by definition, dilution. To suggest that, in any situation where other investors have less voting power after a dilutive transaction, a direct claim also exists turns the most traditional type of derivative claim—an argument that the entity got too little value in exchange for shares—into one always able to be prosecuted directly. *Gentile* cannot be reconciled with the strong weight of our precedent and it ought to be

---

[1] 906 A.2d 91 (Del. 2006).

[2] *See, e.g.*, *Green v. LocatePlus Holdings, Corp.*, 2009 WL 1478553, at *2 (Del. Ch. May 15, 2009) ("Classically, Delaware law has viewed as derivative claims by shareholders alleging that they have been wrongly diluted by a corporation's overpayment of shares."); *see also, e.g.*, *Feldman v. Cutaia*, 951 A.2d 727, 732-33 (2008); *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 774-75 (2006).

[3] *Gentile*, 906 A.2d at 99.

1

overruled, to the extent that it allows for a direct claim in the dilution context when the issuance of stock does not involve subjecting an entity whose voting power was held by a diversified group of public equity holders to the control of a particular interest. But, even in that situation, there is no gap in our law for *Gentile* to fill. *Revlon*[4] already accords a direct claim to stockholders when a transaction shifts control of a company from a diversified investor base to a single controlling stockholder.[5] I agree with the majority that this case does not require us to consider *Gentile*'s ongoing viability in the corporate law context. Sufficient for today is that we refuse to extend *Gentile* further, to a situation where a limited partnership was already firmly under the control of the general partner and where the transaction under attack had no effect whatsoever on limited partner voting rights. But, by refusing to extend *Gentile* to the alternative entity arena, we implicitly recognize that *Gentile* undercuts the clarity and coherence that *Tooley* brought to the determination of what claims are derivative. The lucid majority decision therefore is a big step in the right direction.

---

[4] *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986).

[5] *See Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 43 (Del. 1994).