# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JUDY MESIROV, derivatively and on behalf of all others similarly situated, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **C.A. No. 11314-VCS** |
| | : | |
| ENBRIDGE ENERGY COMPANY, INC., ENBRIDGE, INC., ENBRIDGE ENERGY MANAGEMENT, L.L.C., JEFFREY A. CONNELLY, REBECCA B. ROBERTS, DAN A. WESTBROOK, J. RICHARD BIRD, J. HERBERT ENGLAND, C. GREGORY HARPER, D. GUY JARVIS, MARK A. MAKI, JOHN K. WHELEN, ENBRIDGE PIPELINES (ALBERTA CLIPPER) L.L.C., ENBRIDGE ENERGY, LIMITED PARTNERSHIP, and PIPER JAFFRAY & CO. (as successor to SIMMONS & COMPANY INTERNATIONAL), | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

Date Submitted:  May 30, 2018
Date Decided:  August 29, 2018

Joel Friedlander, Esquire, Jeffrey M. Gorris, Esquire and Christopher P. Quinn, Esquire of Friedlander & Gorris, P.A., Wilmington, Delaware; Jessica Zeldin, Esquire of Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware; and Lawrence P. Eagel, Esquire, Jeffrey H. Squire, Esquire and David J. Stone, Esquire of Bragar Eagel & Squire, PC, New York, New York, Attorneys for Plaintiff.

Thomas W. Briggs, Jr., Esquire and Richard Li, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; and Kevin C. Logue, Esquire, Kevin P. Broughel, Esquire, J. Jeanette Kang, Esquire and Molly L. Leiwant, Esquire of Paul Hastings LLP, New York, New York, Attorneys for Defendants Enbridge Energy Company, Inc., Enbridge Energy Management, L.L.C., Jeffrey A. Connelly, Rebecca B. Roberts, Dan A. Westbrook, Enbridge Energy, Limited Partnership, and Nominal Defendant Enbridge Energy Partners, L.P.

Raymond J. DiCamillo, Esquire, Sarah A. Galetta, Esquire and Lisa A. Schmidt, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware; Michael H. Steinberg, Esquire, Lauren M. Cruz, Esquire and Zachary A. Sarnoff, Esquire of Sullivan & Cromwell LLP, Los Angeles, California; and Penny Shane, Esquire and Yuliya Neverova, Esquire of Sullivan & Cromwell LLP, New York, New York, Attorneys for Defendants Enbridge, Inc., J. Richard Bird, J. Herbert England, C. Gregory Harper, D. Guy Jarvis, Mark A. Maki, John K. Whelen, and Enbridge Pipelines (Alberta Clipper) L.L.C.

T. Brad Davey, Esquire, Matthew F. Davis, Esquire and Jacqueline A. Rogers, Esquire of Potter, Anderson & Corroon LLP, Wilmington, Delaware and Abby F. Rudzin, Esquire of O'Melveny & Myers LLP, New York, New York, Attorneys for Defendant Piper Jaffray & Co. (as successor to Simmons & Company International).

**SLIGHTS, Vice Chancellor**

"It's déjà vu all over again." "Thank you sir, may I have another?" Given the procedural history of this three-year-old case, it is difficult to say who as between Yogi Berra or Kevin Bacon best captures the redundancy of the latest round of pleadings-stage dispositive motions that I endeavor to decide, again, in the following pages. What is not difficult to discern, however, is that I have seen many of the arguments presented in the motions *sub judice* before. That much was clear from the first pages of the Enbridge defendants' opening brief. In ruling on the first motion to dismiss, I followed the defendants' flag and dismissed the then-operative complaint for failure to state legally viable claims. Our Supreme Court reversed and remanded with clear instructions. Notwithstanding these clear instructions, defendants bring motions to dismiss the current version of the complaint on many of the same grounds our Supreme Court has already rejected. Those grounds will find no revival here.

The case arises from a related-party transaction where a master limited partnership, Enbridge Energy Partners, L.P. ("EEP" or the "Partnership"), repurchased a substantial asset from its general partner, Enbridge Energy Company, Inc. ("EEP GP"), for $1.0 billion (the "Transaction").[1] EEP had sold the same asset to the controlling parent of EEP GP at a substantially lower price approximately six

---

[1] Verified Third Am. Compl. ("TAC") 1, ¶¶ 1, 3.

years before the Transaction. That deal spawned its own litigation, and that litigation produced certain rulings from this court and the Delaware Supreme Court that are directly relevant here.

Drawing in part upon rulings in the earlier litigation, I dismissed the first class and derivative complaint brought by an EEP unitholder on the ground that it failed to state claims for breach of fiduciary duty, breach of EEP's limited partnership agreement (the "LPA") or breach of the implied covenant of good faith and fair dealing.[2] As noted, in an opinion that provided needed clarity in the alternative entity space, the Supreme Court reversed, provided certain definitive constructions of the LPA, defined the boundaries of the contractual good faith standard imposed by that contract and remanded for further proceedings consistent with its guidance.[3] Since then, I have granted leave for a new party to be substituted as lead class plaintiff and for the filing of further amendments to the complaint.

Defendants have returned to the well with another motion to dismiss the now-operative complaint for failure to state viable claims under Court of Chancery Rule 12(b)(6) and for failure to comply with Court of Chancery Rule 23.1. For reasons explained below, I conclude that, with few exceptions, Defendants'

---

[2] *Brinckerhoff v. Enbridge Energy Co., Inc.*, 2016 WL 1757283, at *2 (Del. Ch. Apr. 29, 2016) ("*Brinckerhoff IV*"), *rev'd in part*, 159 A.3d 242 (Del. 2017) ("*Brinckerhoff V*").

[3] *Brinckerhoff V*, 159 A.3d at 247, 262.

2

arguments in support of dismissal have already been addressed, and rejected, by the Supreme Court. Those rulings, relating to the scope of EEP GP's potential liability to EEP under the LPA, cannot and will not be revisited here.

Unfortunately, the dismissal in this Court and reversal by the Supreme Court appear to have caused confusion with respect to the viability of claims against defined "Affiliates" of EEP GP for breach of the LPA.[4] This confusion apparently prompted Plaintiff to abandon those claims in the TAC and to replace them with certain "secondary liability" claims against those same "Affiliates."[5] Upon further review of the LPA, I am satisfied that I incorrectly dismissed claims against the Affiliates for breach of the LPA in *Brinckerhoff IV*.[6] As best I can tell, the Supreme Court recognized that error, at least implicitly, in *Brinckerhoff V*.[7] With that said, Plaintiff's secondary liability claims against the Affiliates must fail because those parties cannot aid and abet a breach of, or tortiously interfere with, a contract under

---

[4] *See* LPA, art. II.

[5] *See Brinckerhoff V*, 159 A.3d at 262 (describing aiding and abetting, tortious interference and breach of residual fiduciary duty claims as "secondary liability" claims). *Compare* First Compl. (D.I. 1) at ¶¶ 125–33 (alleging breach of LPA claims against certain EEP GP Affiliates) *with* TAC ¶¶ 163–86 (dropping breach of LPA claim against Affiliates and adding aiding and abetting breach of contractual fiduciary duty and tortious interference with contract claims).

[6] *Brinckerhoff IV*, 2016 WL 1757283, at *12 n.77.

[7] *Brinckerhoff V*, 159 A.3d at 254.

which they themselves owe duties.  Nor do they owe residual fiduciary duties beyond the contractual fiduciary duties set forth in the LPA.  While these secondary liability claims will be dismissed, Plaintiff will be given leave to reinstate its breach of the LPA claim against the Affiliates.

## I.  FACTUAL BACKGROUND

I draw the facts[8] from the allegations in the TAC, documents incorporated by reference or integral to that pleading and judicially noticeable facts.[9]  For purposes of this motion to dismiss, I accept as true the TAC's well-pled factual allegations and draw all reasonable inferences in Plaintiff's favor.[10]

---

[8] A more detailed recitation of the facts can be found in any of the several prior decisions of this Court and the Supreme Court concerning the earlier litigation between these parties and the instant dispute.  *See Brinckerhoff v. Enbridge Energy Co., Inc.*, 2011 WL 4599654 (Del. Ch. Sept. 30, 2011) ("*Brinckerhoff I*"); *Brinckerhoff v. Enbridge Energy Co., Inc.*, No. 574, 2011 (Del. 2012) (Remand Order); *Brinckerhoff v. Enbridge Energy Co., Inc.*, 2012 WL 1931242 (Del. Ch. May 25, 2012) ("*Brinckerhoff II*"), *aff'd*, 67 A.3d 369 (Del. 2013) ("*Brinckerhoff III*"), *abrogated by*, *Brinckerhoff V*, 159 A.3d 242; *Brinckerhoff IV*, 2016 WL 1757283, *rev'd in part*, *Brinckerhoff V*, 159 A.3d 242.

[9] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint).

[10] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169 (Del. 2006).

4

## A. The Parties

Plaintiff, Peter Brinckerhoff Rev. Tr. U.A. DTD 10/17/97, has been an owner of EEP Class A common limited partnership units at all relevant times.[11] The TAC filed on his behalf purports to assert both direct and derivative claims.

Nominal defendant, EEP, is a publicly traded Delaware master limited partnership. Formed in 1991, EEP's purpose is to own and operate the United States portion of a crude oil and liquid petroleum pipeline system extending from the tar sands oil production fields in Western Canada, through the Great Lakes region of the United States and into eastern Canada.[12]

Plaintiff has named multiple Enbridge entities as defendants. Defendant, EEP GP, is a Delaware corporation and EEP's general partner.[13] Defendant, Enbridge Energy Management, L.L.C. ("Enbridge Management"), is a publicly traded Delaware limited liability company that manages the business and affairs of

---

[11] As stated, after Defendants' motions to dismiss the TAC were submitted for decision, the TAC was amended to substitute a different lead plaintiff. *See* D.I. 254. The Verified Fourth Amended Complaint ("FAC") and the TAC are otherwise identical. Accordingly, the Court and parties agreed that there was no need to re-file motions to dismiss the FAC and that the decision here would apply to the TAC and the FAC. References to Plaintiff in this Memorandum Opinion are to the Plaintiff as identified in the TAC, the pleading addressed by the motions *sub judice*.

[12] TAC ¶¶ 31–32.

[13] TAC ¶ 33.

EEP.[14]  EEP GP owns 100% of the voting shares and 11.7% of the listed shares (*i.e.*, LLC membership interests) of Enbridge Management.[15]  EEP GP and Enbridge Management collectively own a 52.8% limited partnership interest in EEP.[16]  Defendant, Enbridge, Inc. ("Enbridge"), is a Canadian corporation that indirectly owns 100% of, and controls, EEP GP.[17]  As such, Enbridge controls, indirectly through EEP GP and Enbridge Management, a 52.8% limited partnership interest in EEP.[18]  Defendants, Enbridge Pipelines (Alberta Clipper) L.L.C. and Enbridge Energy, Limited Partnership, are parties to certain agreements relating to the Transaction that Plaintiff seeks to reform.[19]  Both entities are "under the common control of Enbridge and EEP GP."[20]

---

[14] TAC ¶ 34.

[15] *Id.* ("EEP GP delegated the power and authority to manage EEP to Enbridge Management. . . .").

[16] TAC ¶ 33.  Enbridge Management's publicly traded units are non-voting.  *See id.*

[17] TAC ¶¶ 33, 35.

[18] TAC ¶ 35.

[19] TAC 1, ¶¶ 50–51.

[20] *Id.*

At the time of the Transaction, all of EEP GP's directors and officers held identical positions at Enbridge Management.[21] EEP GP's (and Enbridge Management's) board at that time comprised nine directors, all of whom are named defendants: Jeffrey A. Connelly, Rebecca B. Roberts, Dan A. Westbrook, J. Herbert England, J. Richard Bird, C. Gregory Harper, Mark A. Maki, John K. Whelen and D. Guy Jarvis (collectively, the "Director Defendants").[22] Connelly, Roberts and Westbrook were the members of the EEP GP special committee that was formed to negotiate the Transaction (the "Special Committee").[23]

Defendant, Piper Jaffray & Co., a Delaware corporation, is the successor by merger to Simmons & Company International ("Simmons"), the entity that served as financial advisor to the Special Committee.[24] It is alleged that Simmons specialized in "issuing fairness opinions on conflicted transactions between master limited partnerships and their controlling sponsor entities."[25]

---

[21] TAC ¶ 34.

[22] TAC ¶¶ 39–47.

[23] TAC ¶ 48.

[24] TAC ¶ 49.

[25] *Id.*

## B. The Alberta Clipper Transaction

The Transaction involved EEP's repurchase of a 66.67% interest in the United States segment of the Alberta Clipper pipeline (the "AC Interest") for $1.0 billion from EEP GP.[26] The TAC identifies three metrics by which the Special Committee and Simmons knew that EEP was overpaying for the AC Interest.

*First*, in July 2009, EEP GP purchased from EEP the same AC Interest, including a right to expand the Alberta Clipper (US) pipeline (the "Expansion Right") for $800 million, which represented a multiple of 7x projected EBITDA for the AC Interest (the "2009 Sale").[27] The Expansion Right included rights to projects that would increase the Alberta Clipper (US) pipeline's throughput capacity from 450,000 bpd to 800,000 bpd, a 78% increase in capacity.[28] In contrast to the 2009 Sale, the Transaction price of $1.0 billion represents a multiple of 10.7x

---

[26] TAC ¶¶ 1, 3. It is not entirely clear from the TAC which Enbridge entity (or entities) stood on the other side of the Transaction from EEP. The TAC alleges that EEP acquired the AC Interest from EEP GP. *See, e.g.*, TAC ¶ 1. According to *Brinckerhoff V*, EEP repurchased Enbridge's AC Interest from Enbridge through EEP GP. *See, e.g.*, *Brinckerhoff V*, 159 A.3d at 246 ("In 2014, Enbridge proposed that EEP repurchase Enbridge's interest in the Alberta Clipper project"). That characterization is supported by reasonable inferences drawn from the TAC. *See* TAC ¶¶ 23–25, 63, 78, 99.

[27] TAC ¶ 6.

[28] TAC ¶ 8.

projected EBITDA for the AC Interest.[29]  While the purchase price increased substantially, the AC Interest's projected EBITDA between 2009 and 2015 decreased by almost 20%.[30]  This dramatic decline in value can be attributed to the fact that Canadian crude oil prices had plummeted, tariffs under which the AC Interest transports crude oil were shortened by six years (the passage of time between 2009 and 2015), and the tariff agreement was to be "rebased" shortly after the Transaction would close.[31]

*Second*, the Alberta Clipper (US) pipeline operates under a cost-of-service model that allows it to recover its costs over the expected life of the pipeline.[32] In this regard, the pipeline's current "rate base," which is the remaining capital investment in the pipeline that has not already been recovered, is a meaningful proxy for its current market and fair value.[33]  The pipeline's average rate base was approximately $1.06 billion in 2014 and $1.01 billion in 2015, thus implying that

---

[29] TAC ¶ 6.

[30] TAC ¶ 7.

[31] *Id.*

[32] TAC ¶ 10.

[33] *Id.*

9

the market and fair value of the AC Interest (two-thirds of the pipeline) was between $674 million and $707 million at the time of the Transaction.[34]

*Third*, in a September 12, 2014 memorandum, EEP GP management explained to the EEP GP board that the discounted cash flow equity value of the AC Interest was $478 million.[35] Based on this valuation, at the $1.0 billion nominal Transaction price, which consisted of $694 million in newly issued Class E units and early repayment of a promissory note in the amount of $306 million,[36] EEP paid approximately 45% above EEP GP management's DCF equity value of the AC Interest.[37]

The TAC also alleges that the Transaction was not fair and reasonable to EEP and its public unitholders because EEP GP received disproportionate benefits that the Director Defendants did not consider when approving the Transaction.[38] Specifically, EEP paid the equity portion of the purchase price by issuing to EEP GP 18,114,975 shares of a new class of EEP partnership interests designated as "Class E

---

[34] *Id.*

[35] TAC ¶ 13.

[36] TAC ¶¶ 3, 206.

[37] TAC ¶ 13.

[38] TAC ¶ 19.

10

Units."[39] The Class E Units allegedly have unique tax benefits resulting from the allocation of approximately 62% of gross income associated with the Transaction away from the Class E units to other unit holders (the "Special Tax Allocation").[40] Moreover, the Class E Units have a "Liquidation Preference" that the Class A units do not enjoy. Nevertheless, the Special Committee approved the Transaction without valuing the additional consideration the Liquidation Preference and Special Tax Allocation would provide to EEP GP.[41]

The Special Committee hired Simmons as its financial advisor to evaluate whether the Transaction "was representative of an arm's length transaction."[42] Simmons' fairness opinion stated that the Transaction was fair from a financial point of view.[43] According to Plaintiff, Simmons' analysis ignored the 2009 Sale, the already-exploited Expansion Right with no promise of further expansion rights, the 20% drop in the AC Interest's EBITDA, a shorter tariff term, a cost rebasing in July 2015, the rate base as a meaningful proxy for the AC Interest's current market and

---

[39] TAC ¶ 3.

[40] TAC ¶ 80.

[41] TAC ¶¶ 21–22. The Special Tax Allocation was implemented by amending EEP's Amended and Restated Agreement of Limited Partnership (the "6th LPA"). TAC ¶¶ 1, 87. As noted, references to the 6th LPA or the subsequent 7th LPA are to the "LPA."

[42] *Brinckerhoff V*, 159 A.3d at 249.

[43] TAC ¶¶ 117–18.

fair value, EEP GP's 2014 DCF analysis and the value of the Special Tax Allocation and Liquidation Preference to EEP GP.[44]

### C. The LPA

The LPA addresses EEP's relationship with EEP GP and the Affiliates and memorializes EEP's governance structure. The provisions relevant to this dispute are:

Section 6.6(e):

> Neither the General Partner nor any of its Affiliates shall sell, transfer or convey any property to, or purchase any property from, the Partnership, directly or indirectly, except pursuant to transactions that are fair and reasonable to the Partnership; *provided however*, that the requirements of this Section 6.6(e) shall be deemed to be satisfied . . . as to any transaction on the terms of which are no less favorable to the Partnership than those generally being provided to or available from unrelated third parties.[45]

Section 6.8(a):

> Notwithstanding anything to the contrary set forth in this Agreement, no Indemnitee shall be liable for monetary damages to the Partnership, the Limited Partners, the Assignees or any other Persons who have acquired interests in the Units, for losses sustained or liabilities incurred

---

[44] TAC ¶¶ 9, 12, 14, 21–22, 80, 99, 102.

[45] Emphasis in original. "'Affiliate' means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by or is under common control with, the Person in question." LPA, at. II. "'Person' means an individual or a corporation, partnership, limited liability company, trust, unincorporated organization, association or other entity." LPA, art. II.

12

as a result of any act or omission if such Indemnitee acted in good faith.[46]

Section 6.9(c):

> Whenever a particular transaction . . . is required under this Agreement to be "fair and reasonable" to any Person, the fair and reasonable nature of such transaction . . . shall be considered in the context of all similar or related transactions.

Section 6.10(b):

> [EEP GP] may consult with [advisors], and any act taken or omitted in reliance upon the opinion . . . of such [advisor's] professional or expert competence shall be conclusively presumed to have been done or omitted in good faith and in accordance with such opinion.

Section 6.10(d):

> Any standard of care and duty imposed by this Agreement or under the Delaware Act or any applicable law, rule or regulation shall be modified, waived or limited as required to permit the General Partner to act under this Agreement . . . and to make any decision pursuant to the authority prescribed in this Agreement, so long as such action is reasonably believed by the General Partner to be in the best interests of the Partnership.

Section 6.15(b):

> Notwithstanding anything to the contrary set forth in this Agreement . . . Sections 6.1, . . . 6.6 . . . [and] 6.10 shall apply to [Enbridge Management] to the same extent as such provisions apply to the General Partner.

---

[46] The LPA defines "Indemnitee" to include "[EEP GP], any Person who is or was an Affiliate of [EEP GP] . . . , [and] any Person who is or was an officer, director, employee, partner, agent, or trustee of [EEP GP]. . . ." LPA, art. II.

**D. Plaintiff Challenges the Transaction – *Brinckerhoff IV***

Plaintiff filed his first complaint challenging the Transaction on June 20, 2015. On April 29, 2016, the Court issued a Memorandum Opinion (*Brinckerhoff IV*) in which it dismissed Plaintiff's then-operative complaint upon concluding that EEP GP complied in all respects with the provisions of the LPA in connection with the Transaction. The Court also concluded that Enbridge, Enbridge Management and the Director Defendants could not be held liable for breach of a contract (the LPA) to which they were not parties and, in any event, could not be held liable for money damages unless Plaintiff well-pled that they acted in bad faith (which, the Court held, he had failed to do).[47] Finally, having dismissed the contract-based claims, the Court also dismissed Plaintiff's claims for breach of the implied covenant of good faith and fair dealing, breach of residual fiduciary duties and his claim for reformation or rescission.[48]

**E. The Supreme Court Reversal and Remand – *Brinckerhoff V***

On March 28, 2017, the Supreme Court reversed, in part, *Brinckerhoff IV*, concluding that: (1) this Court had misinterpreted EEP GP's and the Affiliates'

---

[47] *Brinckerhoff IV*, 2016 WL 1757283, at *2, *12 n.77.

[48] *Id.* at *18.

affirmative obligations under the LPA[49]; (2) the Transaction is "expressly governed by Section 6.6(e)"[50]; (3) Plaintiff sufficiently pled bad faith because he pled facts "supporting an inference that EEP GP did not reasonably believe it was acting in the best interest of the partnership" in approving the Transaction[51]; (4) the Special Tax Allocation did not violate Sections 5.2(c) and 15.3(b) of the LPA[52]; (5) Enbridge was an "Affiliate" of EEP GP[53]; and (6) reformation or rescission remain viable equitable remedies that may be awarded in the Court's discretion upon a finding of breach.[54] The Court concluded by "remand[ing] the matter for further proceedings consistent with this Opinion."[55]

---

[49] *Brinckerhoff V*, 159 A.3d at 247. More specifically, the Supreme Court held that the LPA provisions that generally "exculpate EEP GP and others from monetary damages if they act in good faith and replace default fiduciary duties with a contractual good faith standard . . . do not [trump] the specific [provisions]" that set forth EEP GP's and the Affiliates' obligations with regard to contracts between EEP and EEP GP or its Affiliates. *Id.*

[50] *Id.* at 255 (noting that Section 6.6(e) expressly requires that conflicted transactions be "fair and reasonable" to EEP).

[51] *Id.* at 247. *See also id.* at 255 ("Brinckerhoff has pled viable claims that the defendants acted in bad faith when undertaking the Alberta Clipper transaction.").

[52] *Id.* at 257–58.

[53] *Brinckerhoff V*, 159 A.3d at 254.

[54] *Id.* at 262. The Supreme Court did not disturb this Court's dismissal of Plaintiff's breach of the implied covenant of good faith and fair dealing claims. *Id.*

[55] *Id.*

15

## F. Procedural Posture

After *Brinckerhoff V*, Plaintiff amended the complaint three more times, and each amendment was met with a motion to dismiss from Defendants. At issue here is the third amendment, the TAC. That pleading comprises eight counts: Count I asserts breach of the LPA and the implied covenant of good faith and fair dealing against only EEP GP and Enbridge Management (having previously dropped this claim as against Enbridge and the Director Defendants following *Brinckerhoff IV*); Counts II, III, V, VII and VIII assert aiding and abetting and tortious interference with EEP GP's performance of the LPA against Enbridge, the Director Defendants, Enbridge Management and Simmons; Count IV asserts breach of residual fiduciary duties against Enbridge and the Director Defendants; and Count VI seeks reformation or rescission of the Transaction.[56]

The TAC expands on the factual allegations set forth in the first complaint. Thus, the TAC continues to allege the following well-pled facts that were central to the Supreme Court's rulings in *Brinckerhoff V*:

- Enbridge controls a 52.8% limited partnership interest in EEP[57];

- the Transaction did not include Expansion Rights, unlike the 2009 transaction which included expansion projects that would increase the Alberta Clipper

---

[56] These claims are substantially similar to those asserted in the first complaint.

[57] *Brinckerhoff V*, 159 A.3d at 248; TAC ¶ 35.

16

(US) pipeline's throughput capacity from 450,000 to 800,000 bpd, a 78% increase in capacity[58];

- during the time period between the 2009 Sale and the Transaction, the AC Interest "had become much riskier" for a variety of reasons, as reflected in the Alberta Clipper project's nearly 20% decrease in projected EBITDA. Further, tariffs on the Alberta Clipper faced increased risk that they would be rebased with long-term negative effects on revenue. Despite this negative environment, on September 16, 2014, Enbridge proposed a sale of the AC Interest, excluding the earlier Expansion Right, to EEP for $1.0 billion, a multiple of 10.7x projected EBITDA[59];

- "EEP paid $200 million more to repurchase the same assets it sold in 2009, despite declining EBITDA, slumping oil prices, and the absence of the expansion rights sold in 2009…. [and] through the Special Tax Allocation, EEP GP added hundreds of millions of dollars more in benefits for Enbridge to the detriment of the public unitholders."[60]

- EEP GP and Enbridge Management knew (through the Director Defendants) when approving the Transaction that: (a) they did not consider the 2009 transaction despite express direction in the LPA that they do so[61]; (b) Enbridge changed its valuation methodology in 2014 when it valued the AC Interest as a multiple of EBITDA, as compared to 2009, when it valued the AC Interest at cost[62]; (c) they failed to consider that the AC Interest's projected next year EBITDA was 20% lower than it was in 2009, while the asset was valued 25% higher in 2009[63]; (d) they failed to negotiate the purchase price despite the negative oil pricing environment, Enbridge's control over the volume flowing

---

[58] *Brinckerhoff V*, 159 A.3d at 249 n.4; TAC ¶ 8.

[59] *Brinckerhoff V*, 159 A.3d at 250; TAC ¶¶ 6–7.

[60] *Brinckerhoff V*, 159 A.3d at 257; TAC ¶ 152.

[61] TAC ¶¶ 9, 25(a).

[62] TAC ¶¶ 7, 25(c).

[63] TAC ¶ 25(b).

through the pipeline and shorter tariff agreements[64]; (e) they failed to value the Special Tax Allocation benefits to EEP GP, and the corresponding financial detriment to the unaffiliated unitholders[65]; (f) they failed to take into consideration the lack of the Expansion Right sold in 2009[66]; and (g) they relied on a flawed fairness opinion from Simmons.[67]

Defendants have moved to dismiss the TAC both for failure to make a demand on the EEP GP board to prosecute the derivative claims and for failure to state legally viable claims.[68]

## II. LEGAL ANALYSIS

The many chapters of the *Brinckerhoff* saga, in one form or another, each recite the applicable standards of review. I'll not repeat them at length here. Suffice it to say, under Court of Chancery Rule 23.1(a), "the complaint shall [] allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[69] Under Court of Chancery

---

[64] TAC ¶ 7.

[65] TAC ¶ 19.

[66] TAC ¶ 8.

[67] *Brinckerhoff V*, 159 A.3d at 260; *see* TAC ¶ 160.

[68] *See* Def. Piper Jaffray & Co.'s Mot. to Dismiss (D.I. 182); Enbridge Defs.' Mot. to Dismiss (D.I. 183).

[69] Ct. Ch. R. 23.1(a).

Rule 12(b)(6), dismissal is appropriate only if the plaintiff would be unable to recover under "any reasonably conceivable set of circumstances susceptible of proof" based on the facts pled in the complaint.[70]

**A. Demand Futility Was Well-Pled**

The well-pled factual allegations in the TAC mirror those pled in the first complaint that was addressed in *Brinckerhoff IV*.[71] There, this Court held that the complaint adequately pled demand futility.[72] *Brinckerhoff V* did not disturb this finding. Accordingly, it is law of the case that Plaintiff has pled sufficient facts to excuse demand upon EEP GP.[73]

**B. The Direct Breach of Contract Claims Must Be Dismissed**

The TAC purports to state both direct and derivative claims for breach of the LPA. "The *Tooley*[74] direct/derivative test is substantially the same for claims

---

[70] *Gen. Motors S'holder Litig.*, 897 A.2d at 168 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[71] *Compare* TAC ¶¶ 132–37, *with* First Compl. ¶¶ 74–79.

[72] *Brinckerhoff IV*, 2016 WL 1757283, at *9.

[73] "The 'law of the case' is established when a specific legal principle is applied to an issue presented by facts which remain constant throughout the subsequent course of the same litigation." *Kenton v. Kenton*, 571 A.2d 778, 784 (Del. 1990).

[74] *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004).

involving limited partnerships."[75]  Under *Tooley*,

> whether a claim is solely derivative or may continue as a dual-natured claim "must turn solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[76]

Somewhere between the direct and derivative claim lies the "dual-natured claim,"

which arises where:

> (1) a stockholder having majority or effective control causes the corporation to issue 'excessive' shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling shareholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders.[77]

Stated differently, dual-natured claims concern "a controlling shareholder and

transactions that resulted in an improper transfer of *both economic value and voting*

*power* from the minority stockholders to the controlling stockholder."[78]

---

[75] *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1260 (Del. 2016) (internal quotations omitted).

[76] *Id.* (quoting *Tooley*, 845 A.2d at 1033, 1039).

[77] *Id.* at 1263 (quoting *Gentile v. Rossette*, 906 A.2d 91, 100 (Del. 2006)).  I note that there is reason to question whether *Gentile* will remain the law of Delaware.  *See El Paso*, 152 A.3d at 1265-66 (Strine, C. J., concurring); *Charles Almond v. Glenhill Advisors LLC*, 2018 WL 3954733, at *24 (Del. Ch. Aug. 17, 2018) (observing that *Gentile* may be losing purchase); *Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *8–10 (Del. Ch. July 26, 2018) (same).  At the very least, *El Paso* makes clear that *Gentile* and its progeny should be construed narrowly.  *El Paso*, 152 A.3d at 1264.

[78] *El Paso*, 152 A.3d at 1263 (emphasis supplied).

In *El Paso*, the Court observed that "[t]he core theory of Brinckerhoff's complaint was that the Partnership was injured when the defendants caused [the Partnership] to pay too much in the [Transaction]."[79] The same is true here. As explained in *El Paso*,

> Such claims of corporate overpayment are normally treated as causing harm solely to the corporation and, thus, are regarded as derivative. In *Tooley* terms, the harm is to the corporation, because such claims "naturally assert that the corporation's funds have been wrongfully depleted, which, though harming the corporation directly, harms the stockholders only derivatively so far as their stock loses value." The recovery—"restoration of the improperly reduced value"—flows to the corporation.[80]

The TAC does not contain a single allegation regarding voting harm (in addition to economic harm) such that it could viably plead a dual-natured claim. This is not surprising given that the Transaction involved EEP's acquisition of a discreet asset, albeit from a controller. Moreover, "to prove that a claim is direct, a plaintiff 'must demonstrate that the duty breached was owed to the stockholder and

---

[79] *Id.* at 1260–61 (first alteration in original). Mr. Brinckerhoff was also the plaintiff in *El Paso.*

[80] *El Paso*, 152 A.3d at 1261. *See also Sciabacucchi*, 2018 WL 3599997, at *7 ("In the typical corporate overpayment case, a claim against the fiduciaries for redress as exclusively derivative.") (citation omitted).

21

that he or she can prevail without showing an injury to the corporation.'"[81] Section 6.6(e) states that in a conflicted transaction, such as the Transaction at issue here, the "General Partner or any Affiliate" has a duty to act in a manner that is "fair and reasonable *to the Partnership*."[82] One of the ways in which EEP GP and the Affiliates can meet that duty is if the Transaction terms are "no less favorable *to the Partnership* than those being provided to or available from unrelated third parties."[83] Indeed, by its terms, Section 6.6(e) does not grant any protections directly to EEP's individual unitholders. Accordingly, a breach of Section 6.6(e), as alleged here, cannot give rise to a direct claim. To the extent the TAC purports to state direct claims for harm flowing from the Transaction, the motion to dismiss those claims must be granted.

## C. The Derivative Claims for Breach of Contract Survive Dismissal

As for Plaintiff's derivative claim for breach of contract against EEP GP as stated in Count I, the Supreme Court has already held that Plaintiff's allegations in the first Complaint (which are still present in the TAC) "are sufficient to state a claim

---

[81] *Id.* at 1260 (quoting *Tooley*, 845 A.2d at 1033, 1039).

[82] Emphasis supplied.

[83] LPA § 6.6(e) (emphasis supplied).

for breach of the requirements of Section 6.6(e)."[84]  This is the law of the case and I see absolutely no basis to revisit it.[85]  Accordingly, Defendants' motion to dismiss this aspect of Count I must be denied.

### D. *Brinckerhoff IV* Incorrectly Dismissed the Breach of the LPA Claim Against "Affiliates" and "Indemnitees"

"[T]he . . . Transaction is expressly governed by Section 6.6(e)."[86]  And, as described by the Supreme Court, the Transaction involved EEP, EEP GP and EEP GP Affiliates (Enbridge and Enbridge Management):

> The Alberta Clipper transaction is a contract with an Affiliate (Enbridge) to sell property (Alberta Clipper Interest) back to the Partnership (EEP).  Section 6.6, entitled "Contracts with Affiliates," and in particular Section 6.6(e), directly addresses the affirmative obligation EEP GP must satisfy for such transactions: "[n]either the General Partner nor any of its Affiliates shall sell, transfer or convey any property to, or purchase any property from, the Partnership, directly

---

[84] *Brinckerhoff V*, 159 A.3d at 257.

[85] I note that the Supreme Court affirmed this Court's holding that the Special Tax Allocation did not violate Sections 5.2(c) and 15.3(b) of the LPA.  *Brinckerhoff V*, 159 A.3d at 257–58.  Therefore, Sections 5.2(c) and 15.3(b) cannot form the basis of Plaintiff's breach of contract claim.  The Supreme Court also noted, however, that the Special Tax Allocation is a factual predicate of Plaintiff's claim that the Transaction was not "fair and reasonable to the Partnership."  *Id.* at 257 ("According to Brinckerhoff, EEP paid $200 million more to repurchase the same assets it sold in 2009, despite declining EBITDA, slumping oil prices, and the absence of the expansion rights sold in 2009.  He also alleged that, through the Special Tax Allocation, EEP GP added hundreds of millions of dollars more in benefits for Enbridge to the detriment of the public unitholders.  These allegations are sufficient to state a claim for breach of the requirements of Section 6.6(e).").  Thus, evidence relating to the Special Tax Allocation may be relevant to support Plaintiff's other breach of contract claims.

[86] *Id.* at 255.

or indirectly, except pursuant to transactions that are fair and reasonable to the Partnership."[87]

In *Brinkerhoff I*, the court likewise concluded that Enbridge was an Affiliate under the LPA:

> The LPA states that "'Affiliate' means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by or is under common control with, the Person in question." Enbridge is alleged to control EEP GP, and thus, for the purposes of a motion to dismiss, Enbridge is an 'Affiliate' of EEP GP.[88]

Enbridge's status as an EEP GP Affiliate is significant under Section 6.6(e) because, like EEP GP, Enbridge was obliged not to "sell, transfer or convey any property to, or purchase any property from" EEP "except pursuant to transactions that are fair and reasonable to [EEP]."[89]

As noted in *Brinckerhoff I*, the LPA "does not stop there."[90] At Section 6.8(a), the LPA provides:

> Notwithstanding anything to the contrary set forth in this Agreement, no Indemnitee shall be liable for monetary damages to the Partnership,

---

[87] *Id.* at 254. As defined, Enbridge Management is also expressly identified as an "Affiliate" of EEP GP. *See* LPA, art. II (definition of Affiliate – "For purposes of this Agreement, [Enbridge Management] is an Affiliate of [EEP GP].").

[88] *Brinckerhoff I*, 2011 WL 4599654, at *8, *aff'd*, *Brinckerhoff III*, 67 A.3d 369, *rev'd on other grounds*, *Brinckerhoff V*, 159 A.3d at 259–60. *See also* TAC ¶ 35 (alleging that EEP GP is controlled by Enbridge).

[89] LPA, § 6.6(e).

[90] *Brinckerhoff I*, 2011 WL 4599654, at *8.

24

the Limited Partners, the Assignees or any other Persons who have acquired interests in the Units, for losses sustained or liabilities incurred as a result of any act or omission if such Indemnitee acted in good faith.[91]

"The LPA defines 'Indemnitee' to include '[EEP GP], any person who is an Affiliate of [EEP GP] [to include Enbridge and Enbridge Management] . . . [and] any Person who is or was an officer, director, employee, partner, agent or trustee of [EEP GP] . . . [to include the Director Defendants].'"[92]  *Brinckerhoff I* continued:

> Read together, Article 6.8(a) and the LPA's definitions of "Indemnitee" and "Affiliate" provide that the only duty that EEP or its unit holders may successfully hold the Defendants monetarily liable for is a breach of the duty to act in good faith.  The LPA's definition of "Indemnitee" includes EEP GP, EEP GP's Board, and "Affiliates" of EEP GP. As mentioned above, Enbridge is an "Affiliate" of EEP GP because Enbridge is alleged to control EEP GP.  Moreover, Enbridge Management is an "Affiliate" of EEP GP because it is alleged to be "under common control with" EEP GP.  Thus, EEP GP, EEP GP's Board, Enbridge, and Enbridge Management is each an "Indemnitee" for purposes of the LPA, and Article 6.8(a) explicitly states that an "Indemnitee" will not be liable to EEP or its unit holders for any actions taken in good faith.[93]

With this construction in mind, *Brinckerhoff I* concluded:

> With regard to the other Defendants [Enbridge, Enbridge Management and the Director Defendants], EEP or its unit holders may only, under the LPA, successfully hold them monetarily liable for a breach of the duty to act in good faith.  Thus, in order to survive the Defendants'

---

[91] *Id.* (quoting LPA § 6.8(a)).

[92] *Id.*

[93] *Id.* at *9.

motions to dismiss, Brinckerhoff must plead facts suggesting that the Defendants acted in bad faith.[94]

In *Brinckerhoff IV,* I held that claims against defendants other than EEP GP under the LPA could not be sustained since none of the other defendants is a party to the LPA.[95] According to *Brinckerhoff I,* as affirmed by *Brinckerhoff III* and again implicitly by *Brinckerhoff V*, this holding in *Brinckerhoff IV* was wrong. Claims against the Affiliates and Indemnitees under the LPA will survive dismissal if the Plaintiff has well-pled that they acted in bad faith. And *Brinckerhoff V* already held that Plaintiff "has pled viable claims that the defendants acted in bad faith when undertaking the [Transaction]."[96] Thus, Plaintiff's claims against Enbridge, Enbridge Management and the Director Defendants for breach of the LPA may be reasserted in an amended complaint should Plaintiff choose to reinstate them.[97]

---

[94] *Id.*

[95] *Brinckerhoff IV*, 2016 WL 1757283, at *12 n.77 ("To the extent Brinckerhoff's claims against the defendants other than EEP GP sound in breach of contract, the claims fail as a matter of law as Delaware does not recognize breach of contract claims against non-parties to the contract.") (citations omitted). I note that in addition to being an Affiliate, per Section 6.15(b) of the LPA, Enbridge Management is bound by Sections 6.6 and 6.10 to the same extent EEP GP is bound. *See* LPA, § 6.15(b); TAC ¶ 34.

[96] *Brinckerhoff V*, 159 A.3d at 255.

[97] Under the circumstances, Court of Chancery Rule 15(aaa) would not bar the amendment since the Court incorrectly dismissed the claims in an earlier ruling and the Plaintiff was justified in amending his complaint to account for that dismissal (by dropping the claim). The latest round of dispositive motion practice did not implicate the improperly dismissed claims because they had already been dropped in a previously amended complaint.

26

## E. This Court's Prior Dismissal of the Breach of the Implied Covenant Claims Remains in Place

With regard to EEP GP's, Enbridge Management's (and, if amended, the Affiliates' and Indemnitees') alleged breach of the implied covenant of good faith and fair dealing, *Brinckerhoff V* held that "the Alberta Clipper transaction is expressly governed by Section 6.6(e)."[98]  Accordingly, the Supreme Court left undisturbed this Court's determination that "the LPA contemplates each breach alleged in the Complaint" and that there was "no reasonable basis to allow the implied covenant claims to stand."[99]  In keeping with the law of the case, to the extent the TAC purports to state a claim for breach of the implied covenant (in Count I or elsewhere), Defendants' motion to dismiss that claim must be granted.

## F. The "Secondary Claims" for Aiding and Abetting Breach of Contractual Fiduciary Duties, Tortious Interference with Contract and Breach of Residual Fiduciary Duties Against the Affiliates and Indemnitees Are Dismissed

Plaintiff alleges in Count II that Enbridge and the Director Defendants aided and abetted EEP GP and Enbridge Management's breaches of contractual fiduciary

---

*See TVI Corp. v. Gallagher*, 2013 WL 5809271, at \*20–21 (Del. Ch. Oct. 28, 2013) (holding that Rule 15(aaa) does not apply when a proposed amendment is "not within the purview" of a previously decided motion to dismiss).

[98] *Brinckerhoff V*, 159 A.3d at 254.

[99] *Brinckerhoff IV*, 2016 WL 1757283, at \*18.

duties.[100] At Count V, Plaintiff alleges that if Enbridge Management is not liable for breach of contractual fiduciary duties, it is liable as an aider and abettor.[101] At Count III, Plaintiff alleges that Enbridge and the Director Defendants tortiously interfered with EEP GP's performance of the LPA.[102] Plaintiff also claims, in the alternative, that if Enbridge Management is not liable for breach of contract, it is liable for tortious interference with contract.[103] And then, at Count IV, Plaintiff alleges that Enbridge and the Director Defendants breached residual fiduciary duties.[104] For reasons explained below, these secondary claims fail as a matter of law.

### 1. Aiding and Abetting Breach of Contractual Fiduciary Duties

Delaware law generally does not recognize a claim for aiding and abetting a breach of contract.[105] When a contract embraces a fiduciary standard of conduct,

---

[100] TAC ¶¶ 163–74, 207–16. The first complaint did not assert aiding and abetting against Simmons.

[101] TAC ¶ 199.

[102] TAC ¶¶ 175–86.

[103] TAC ¶ 199.

[104] TAC ¶¶ 187–96.

[105] *See Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 172 (Del. 2002); *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013) ("Limited partnership agreements are a type of contract.").

however, one who aids and abets a breach of that standard can be held liable for aiding and abetting a breach of a "contractual fiduciary duty."[106] Even so, in the master limited partnership context, this court has made clear that when the limited partnership agreement expressly eliminates all fiduciary duties, there can be no "contractual fiduciary duty" and, therefore, there can be no aiding and abetting a breach of that duty.[107] In the shadow of this settled law, the viability (or not) of Plaintiff's aiding and abetting claims, at least at the threshold, turns on whether the LPA expressly eliminated all fiduciary duties, including contractual duties.[108]

According to Plaintiff, "[t]he [Supreme] Court [has already] interpreted the 'fair and reasonable' standard [in Section 6.6(e)] as something similar, if not equivalent, to entire fairness review, a contractual fiduciary standard. . . ."[109] Even a cursory review of *Brinckerhoff V* reveals that this is, in fact, precisely what the

---

[106] *See Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 194 (Del. Ch. 2014) (citing *Gotham P'rs, L.P.*, 817 A.2d at 173) (recognizing the creation of "contractual fiduciary duties"); *Feely v. NHAOCG, LLC*, 62 A.3d 649, 659 (Del. Ch. 2012) (holding plaintiff pled a viable aiding and abetting breach of a contractual fiduciary duty claim since the contractual standard at issue was intended to "supplant traditional fiduciary duties") (citation omitted).

[107] *Dieckman v. Regency GP LP*, 2018 WL 1006558, at *4 (Del. Ch. Feb. 20, 2018).

[108] *Id.*

[109] Pl.'s Answering Br. to Enbridge Defs.' Mot. to Dismiss 2 (internal quotations omitted) (citing *Brinckerhoff V*, 159 A.3d at 262) (D.I. 212).

Supreme Court said.[110]  Indeed, contrary to the LPA at issue in *Dieckman* (invoked

by defendants here), which expressly eliminated *all* fiduciary duties (contractual or

at common law),[111] Section 6.10(d) of the LPA modifies, waives or limits common

law duties in favor of a contractual scheme that imports familiar fiduciary standards:

> Any standard of care and duty imposed by this Agreement or under the
> Delaware Act of any applicable law, rule or regulation shall be
> modified, waived or limited as required to permit the General Partner
> to act under this Agreement and any other agreement contemplated by
> this Agreement and to make any decision pursuant to the authority
> prescribed in this Agreement, so long as such action is reasonably
> believed by the General Partner to be in the best interests of the
> Partnership.

In *Norton v. K-Sea Transp. Partners, L.P.*, the Supreme Court interpreted language

nearly identical to Section 6.10(d) and held that it "eliminates any [common law

fiduciary] duties that otherwise exist and replaces them with a contractual fiduciary

duty. . . ."[112]  *Brinckerhoff V* revisited this language but ultimately chose "not to

upset *Norton*'s settled interpretation of Section 6.10(d)."[113]  Thus, the fact that the

---

[110] *Brinckerhoff V*, 159 A.3d at 262 ("EEP GP faces potential liability for breach of Section 6.6(e), under a contractual fiduciary standard similar if not identical to entire fairness.").

[111] *See Dieckman*, 2018 WL 1006558, at \*2, \*4.

[112] 67 A.3d at 362.

[113] *Brinckerhoff V*, 159 A.3d at 253–54.  The Enbridge Defendants acknowledge as much in their reply brief.  *See* Enbridge Defs.' Reply Br. 23 (D.I. 227).

aiding and abetting claim is tied to a contractual duty does not necessarily defeat the claim.

That the aiding and abetting claim is conceptually viable does not end the inquiry. Plaintiff alleges that Enbridge, Enbridge Management and the Director Defendants aided and abetted EEP GP in breaching Section 6.6(e).[114] Yet, as discussed above, each of the alleged aider and abettors owe their own duties to EEP under the express terms of Section 6.6(e). They cannot, therefore, be held liable for aiding and abetting a breach of that provision.[115] Counts II and V (aiding and abetting against Enbridge Management) are dismissed.

## 2. Tortious Interference with Contract

"[A] party to a contract cannot tortiously interfere with that same contract. . . ."[116] In other words, Delaware law generally requires that a defendant to a tortious interference claim "be a stranger to both the contract and the business

---

[114] TAC ¶¶ 163–74, 197–200.

[115] *Gotham P'rs, L.P.*, 817 A.2d at 172 ("[A] claim for aiding and abetting a breach of a fiduciary duty [requires] . . . a defendant, *who is not a fiduciary* . . . and [] damages to the plaintiff result[ing] from the concerted action of the fiduciary and *the non-fiduciary*." (emphasis supplied)) (quoting *Fitzgerald v. Cantor*, 1999 WL 182573, at *1 (Del. Ch. Mar. 25, 1999)).

[116] *Grunstein v. Silva*, 2009 WL 4698541, at *16 (Del. Ch. Dec. 8, 2009); *Tenneco Auto., Inc. v. El Paso Corp.*, 2007 WL 92621, at *5 (Del. Ch. Jan. 8, 2007) (holding that one cannot tortiously interfere with a contract to which it is a party); *Shearin v. E.F. Hutton Gp., Inc.*, 652 A.2d 578, 590 (Del. Ch. 1994) (same).

relationship giving rise to and underpinning the contract."[117]  Enbridge, Enbridge Management and the Director Defendants are not strangers to the LPA or to the Transaction.  The tortious interference with contract claims against them (Counts III and V), therefore, must be dismissed.

### 3. Breach of Residual Fiduciary Duties

Plaintiff alleges breach of residual fiduciary duties against Enbridge and the Director Defendants for "caus[ing] the Partnership to enter into the Transaction in breach of Section 6.6(e)."[118]  The Supreme Court held that Section 6.6(e), the LPA provision that expressly governs the Transaction,[119] replaces any common law duty with a contractual fiduciary duty that is "similar, if not equivalent to entire fairness review."[120]  As EEP GP Affiliates, Enbridge and the Director Defendants are bound by Section 6.6(e).[121]  *Brinckerhoff I* held*, and *Brinckerhoff III* and *Brinckerhoff V* (at least implicitly) affirmed, that claims against the Affiliates and Indemnitees under the LPA will survive dismissal if the Plaintiff well-pleads their actions meet

---

[117] *AM General Holdings LLC v. Renco Group, Inc.*, 2013 WL 5863010, at *12 (Del. Ch. Oct. 31, 2013) (citing *Tenneco Auto. Inc.*, 2007 WL 92621, at *5).

[118] TAC ¶ 193.

[119] *Brinckerhoff V*, 159 A.3d at 255.

[120] *Id.* at 256–57.

[121] *See Brinckerhoff I*, 2011 WL 4599654, at *8.

"the definition of bad faith that is . . . incorporated into the Enbridge LPA."[122]  The contractual fiduciary duty stated in Section 6.6(e) supplants any residual fiduciary duties that Enbridge and the Director Defendants might otherwise have owed to EEP in connection with the Transaction.  Thus, Count IV must be dismissed.

**G. The Claim for Aiding and Abetting Against Simmons Survives Dismissal**

Having concluded that the LPA sets forth "contractual fiduciary duties," and that the TAC states a claim that EEP GP and Enbridge Management breached those duties, the Court must now determine whether the TAC pleads that Simmons aided and abetted those breaches (as alleged in Count VII) under a reasonably conceivable standard.  According to Plaintiff, Simmons knowingly aided and abetted the breach by delivering a fairness opinion that inexplicably failed to consider the comparable 2009 transaction (where EEP sold the AC Interest to EEP GP) and failed to account for the fact that all other available valuation metrics revealed that EEP was paying too much.[123]  The first complaint did not assert an aiding and abetting claim against Simmons, so the Supreme Court did not address that claim in *Brinckerhoff V*.

Under Delaware law, in order to state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege: (1) the existence of a fiduciary relationship;

---

[122] *Brinckerhoff V*, 159 A.3d at 252.

[123] TAC ¶ 160.

(2) a breach of that relationship; (3) "knowing participation" by the defendant non-fiduciary in the fiduciary's breach; and (4) damages proximately caused by the breach.[124] Here, as is often the case, the viability of Plaintiff's aiding and abetting claim as to Simmons turns on whether the TAC adequately pleads that Simmons "knowingly participated" in EEP GP's and Enbridge Management's breaches of the LPA's contractual fiduciary duties.

In *Malpiede v. Townson*, our Supreme Court held that "[k]nowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach."[125] Stated differently, "[i]f the third party knows that the board is breaching its duty . . . and participates in the breach by misleading the board or creating the informational vacuum, then the third party can be liable for aiding and abetting."[126] This standard requires well-pled facts that the alleged aider and abettor acted with "scienter,"[127]

---

[124] *See Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001); *RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 861 (Del. 2015) (affirming decision after trial finding investment bank liable for aiding and abetting breaches of fiduciary duty).

[125] *Malpiede*, 780 A.2d at 1097 (citations omitted); *RBC Capital Mkts., LLC*, 129 A.3d at 861–62.

[126] *In re Rural Metro Corp. S'holders Litig.*, 88 A.3d 54, 97 (Del. Ch. 2014), *aff'd*, *RBC Capital Mkts., LLC*, 129 A.3d 816.

[127] *See Singh v. Attenborough*, 137 A.3d 151, 152 (Del. 2016).

meaning with "an illicit state of mind."[128]  That is, the complaint must plead facts that allow a reasonable inference that the aider and abettor acted knowingly, intentionally or with reckless indifference.[129]  The scienter pleading requirement is among the most difficult in our law to satisfy.[130]

According to Simmons, Plaintiff's aiding and abetting claim against it rests entirely on a recitation of the reasons why Plaintiff believes Simmons' fairness opinion is wrong, not on any well-pled facts that would support a reasonable inference of scienter.[131]  I disagree.

By letter dated September 16, 2014, Enbridge proposed that EEP repurchase the AC Interest for $915 million.[132]  Enbridge based this first offer on projected 2015

---

[128] *RBC Capital Mkts., LLC*, 129 A.3d at 862.

[129] *Id.  See also id.* ("To establish scienter, the plaintiff must demonstrate that the aider and abettor had 'actual or constructive knowledge that [its] conduct was legally improper.'") (citing *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008)).

[130] *Id.* at 866.  *See, e.g.*, *Malpiede*, 780 A.2d at 1097–98 (finding "that the plaintiffs' aiding and abetting claim fails as a matter of law because the allegations in the complaint do not support an inference that [the alleged aider and abettor] knowingly participated in a fiduciary breach"); *Lee v. Pincus*, 2014 WL 6066108, at *13 (Del. Ch. Nov. 14, 2014) (noting that "[k]nowing participation has been described as a 'stringent' standard that 'turn[s] on proof of scienter'") (citing *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1039 (Del. Ch. 2006)); *Morgan v. Cash*, 2010 WL 2803746, at *4–5 (Del. Ch. July 16, 2010) (granting a motion to dismiss upon concluding that knowing participation was not well-pled).

[131] Def. Piper Jaffray & Co.'s Mot. to Dismiss 45.

[132] TAC ¶ 63; Enbridge Defs.' Opening Br. Ex. 4 (D.I. 191).

EBITDA for the AC Interest of $83.3 million and an 11x EBITDA multiple.[133]

Simmons was retained by Enbridge Management and EEP on October 8, 2014, to provide "an opinion as to whether or not the Transaction [was] fair to Partners and the unitholders of Partners."[134] Simmons performed this service in exchange for a fee of $600,000—$100,000 as an initial advisory fee and $500,000 payable upon delivery of the fairness opinion, plus expenses.[135] This was to be the fourth fairness opinion Simmons would provide to Enbridge Management within a span of nineteen months.[136]

On November 23, 2014, EEP GP increased the offer to $1.025 billion based on a revised projected 2015 EBITDA for the AC Interest of $93.2 million and an 11x EBITDA multiple.[137] A month later, on December 23, 2014, Simmons delivered its fairness opinion at this price by letter addressed to Enbridge Management, later

---

[133] TAC ¶ 131(b) (Plaintiff alleges that Enbridge executives, EEP GP and Enbridge Management "manipulat[ed] projected 2015 EBITDA to justify an $85 million increase in the purchase price even though the changes to 2015 EBITDA consisted largely of one-time items that involved shifting costs between years rather than an increase in the earnings power of the AC Interest. . . .").

[134] Def. Piper Jaffray & Co.'s Opening Br. Ex. 1 (D.I. 192); TAC ¶ 66.

[135] *Id.*

[136] TAC ¶¶ 27, 66. Plaintiff avers that on three previous occasions Simmons "rubberstamped" Enbridge Management conflict transactions. TAC ¶ 251. *See also* Def. Piper Jaffray & Co.'s Opening Br. Ex. 2.

[137] Enbridge Defs.' Opening Br. Ex. 3.

supported by a presentation to Enbridge Management acting on behalf of EEP GP.[138]

Plaintiff alleges that, in reaching its fairness opinion, Simmons: (1) "reviewed and analyzed" the LPA[139]; (2) used an "implied transaction value to EBITDA multiple of 10.7x" and a valuation that "had been pre-announced via press-release"[140]; (3) used only the revenue, operating expense and maintenance capital expenditure estimates provided by the seller (EEP GP)[141]; (4) did not incorporate valuation constraints or declining prospects typically associated with cost-of-service models into its analysis[142]; (5) knew of the September 12, 2014 memo given to EEP GP's Special Committee explaining the AC Interest's $478 million valuation based on an 8.5% cost of equity, which, due to EEP's higher cost of equity, implies an even lower discounted cash flow value for the AC Interest[143]; (6) did not consider the 2009 sale of the AC Interest from EEP to EEP GP, by far the most relevant comparable transaction[144]; (7) performed no valuation of the Class E preferred units and

---

[138] TAC Ex. B ("Simmons Presentation"); Def. Piper Jaffray & Co.'s Opening Br. Ex. 2.

[139] Simmons Presentation 36.

[140] Simmons Presentation 2, 37.

[141] Simmons Presentation 27.

[142] TAC ¶¶ 12, 27.

[143] TAC ¶ 26(b).

[144] TAC ¶¶ 9, 27. *See also* LPA, § 6.9(c) ("Whenever a particular transaction . . . is required under this Agreement to be "fair and reasonable" to any Person, the fair and reasonable

inexplicably assigned Class E preferred units the same value as Class A common units, despite their considerable tax benefit and liquidation preference[145]; and then (8) inexplicably concluded that the Transaction to (a) sell the AC Interest to EEP for $1.0 billion, and (b) allocate all of EEP GP's $410 million taxable gain on the sale to EEP unitholders was "fair to Partners and to the holders of Partners' common units. . . ."[146]

Simmons' response to these allegations is to invoke *In re Rural Metro Stockholders Litigation* as the litmus test for financial advisor aiding and abetting and to argue that its conduct does not come close to the conflict-driven misconduct at issue there.[147] To be sure, the allegations against Simmons in the TAC do not implicate the kind of transactional conflicts (where the banker derived benefits from both the buy and sell sides) that led to the court's verdict against RBC in *In re Rural*

---

nature of such transaction . . . shall be considered in the context of all similar or related transactions."). *See RBC Capital Mkts., LLC*, 129 A.3d at 842 (finding the advisor had modified its precedent transaction analysis to reach a desired conclusion).

[145] Pl.'s Answering Br. to Def. Piper Jaffray & Co.'s Mot. to Dismiss 19. Enbridge and EEP GP hired Ernst & Young LLP ("E&Y") to complete a "draft analysis" of the Class E units. The E&Y draft analysis was completed on February 15, 2015. With respect to the Class E units, E&Y estimated the present value of the: Special Tax Allocation to be $12.17 per Class E unit, Liquidation Preference to be $4.66 per Class E unit and total fair value to be $53.39 per Class E unit, as of the Transaction date. TAC ¶¶ 18, 21, 108. For whatever reason, Simmons elected not to undertake this Class E valuation analysis. *Id.*

[146] Simmons Presentation 2, 33, 37.

[147] Def. Piper Jaffray & Co.'s Opening Br. 2; *In re Rural Metro*, 88 A.3d 54.

*Metro.* But that does not mean the allegations of aiding and abetting here are not well-pled.

Plaintiff has alleged that Simmons, a financial advisor very familiar with the energy industry, used a manipulated valuation to support a fairness opinion that not only failed to reconcile, but also completely ignored, a comparable transaction involving a sale of the same asset five years prior.[148] Simmons did not account for, and did not prompt the Special Committee to account for, the additional consideration that would flow to EEP GP through the Special Tax Allocation,[149] nor was the Special Committee able to discern the value of a Class E preferred unit from Simmons' work.[150] Indeed, it is alleged that Simmons created an "informational vacuum" with regard to Class E unit value that made assessing value difficult if not impossible.[151] The TAC also well-pleads that Simmons was content to base its fairness opinion on EEP GP's "fully baked," "last-minute manipulations of 2015

---

[148] *See RBC Capital Mkts., LLC*, 129 A.3d at 865 n.191 ("The banker is under an obligation not to act in a manner that is contrary to the interests of the board of directors, thereby undermining the very advice that it knows the directors will be relying upon in their decision making processes.").

[149] TAC ¶ 155(f).

[150] TAC ¶ 22.

[151] *Id.* Plaintiff alleges that "[n]either the Special Committee nor Simmons performed any valuation of the Class E Units, the Special Tax Allocation, or the Liquidation Preference."

projected EBITDA," again creating informational gaps that ultimately aided and abetted EEP GP and Enbridge Management in their breaches of the LPA's contractual fiduciary duties.[152]  Finally, the TAC alleges that Simmons was willing to perform its perfunctory valuation, as it had in the past, in order to preserve its longstanding relationship with Enbridge, knowing well that EEP GP and Enbridge would invoke the fairness opinion as a means to escape liability for breach of fiduciary duty following the closing of the Transaction.[153]

This court most typically dismisses claims for aiding and abetting against financial advisors when the complaint fails to allege facts from which it may reasonably be inferred that directors were relying upon the financial advisor to

---

[152] *See Singh*, 137 A.3d at 152 ("[A]n advisor whose bad-faith actions cause its board clients to breach their situational fiduciary duties . . . is liable for aiding and abetting."); *RBC Capital Mkts., LLC*, 129 A.3d at 842 (finding the advisor had inexplicably modified its precedent transaction analysis).  *See also Brinckerhoff V*, 159 A.3d at 261 (holding that EEP GP is not entitled to Section 6.10(b)'s conclusive presumption of good faith because Plaintiff had well pled that EEP GP "could not have reasonably relied on" the Simmons fairness opinion due to its use of the "fully baked" financial terms and failure to consider the most relevant precedent transaction—the 2009 Alberta Clipper transaction—when it was acting under a standard that expressly required consideration "of all similar or related transactions.").  The fact that the Supreme Court determined that EEP GP could not rely on the Simmons fairness opinion as a basis to invoke the financial advisor "safe harbor" (at the pleadings stage) cannot be ignored as the Court considers whether it is reasonably conceivable that Simmons' fairness opinion did not reflect its objective view of the fairness of the Transaction.

[153] TAC ¶¶ 27, 117.  Simmons analyzed the LPA, which includes LPA § 6.10(b)'s conclusive presumption of good faith when EEP GP relies in good faith on an advisor's opinion.  *See* Simmons Presentation 36.

provide information that the board did not already know[154] or that the advisor knew the board was breaching its fiduciary duties.[155] These are difficult facts to muster at the pleadings stage; yet it is appropriate to put the plaintiff to that burden before requiring an advisor to the board to defend its advice as an aider and abettor in litigation.[156] Even so, the burden is not insurmountable.[157] Drawing all reasonable inferences in Plaintiff's favor, as I must,[158] I am satisfied that Plaintiff has stated a viable claim for aiding and abetting a breach of fiduciary duty against Simmons.[159] The motion to dismiss Count VII, therefore, must be denied.

---

[154] *See, e.g.*, *Buttonwood Tree Values P'rs, L.P. v. R.L. Polk & Co., Inc.*, 2017 WL 3172722, at *10 (Del. Ch. July 24, 2017) (dismissing aiding and abetting claim against an advisor to the board when it was clear from the complaint and properly considered documents that what plaintiff alleged the advisor had failed to communicate was already known to the board).

[155] *See Singh*, 137 A.3d at 152; *Nebenzahah v. Miller*, 1996 WL 494913, at *7 (Del. Ch. Aug. 29, 1996) (holding that a court can infer a non-fiduciary's knowing participation if a fiduciary breaches its duties in an "inherently wrongful manner," but dismissing the aiding and abetting claim because plaintiffs did not allege such facts).

[156] *See Singh*, 137 A.3d at 152.

[157] *See In re Shoe-Town S'holders Litig.*, 1990 WL 13475, at *8 (Del. Ch. Feb. 12, 1990) (recognizing difficult pleading burden but declining to dismiss aiding and abetting claim against financial advisor upon concluding that the complaint adequately alleged that the financial advisor was "closely involved with the management group" on the other side of the transaction at issue and had performed a result-driven analysis).

[158] *Gen. Motors S'holder Litig.*, 897 A.2d at 169.

[159] To hold that Plaintiff has adequately pled an aiding and abetting claim against Simmons is a far cry from predicting that Plaintiff will prevail in the Herculean task of supporting the pled facts in discovery or proving them at trial. *See In re Rural Metro*, 88 A.3d at 100

### H. The Tortious Interference with Contract Claim Against Simmons Is Dismissed

Count VIII asserts tortious interference with contract against Simmons. The claim was not pled in the first complaint so the Supreme Court had no occasion to address it in *Brinckerhoff V*.

To maintain a claim for tortious interference under Delaware law, a plaintiff must prove: (1) a contract; (2) about which defendants knew; and (3) an intentional and improper act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury.[160] There is no dispute that the LPA was a contract about which Simmons knew. The viability of Plaintiff's tortious interference claim against Simmons, therefore, will depend on whether Plaintiff has well-pled an "intentional and improper" act of interference undertaken "without justification."

Delaware is a Restatement (Second) of Torts jurisdiction.[161] When considering whether an action is improper or taken without justification such that it

---

(noting the difficulty in proving that a financial advisor was incented to knowingly aid in a breach of fiduciary duty) (internal citations and quotation marks omitted); *In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 448 (Del. Ch. 2012) (observing that "it is difficult to prove an aiding and abetting claim") (citations omitted).

[160] *Irwin & Leighton, Inc. v. W.M. Martin Co.*, 532 A.2d 983, 992 (Del. Ch. 1987) (Allen, C.); *AM Gen. Hldgs. LLC*, 2013 WL 5863010, at *12.

[161] *ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749, 751 (Del. 2010).

can constitute tortious interference, Delaware courts look to the general factors set forth in Section 767 of the Restatement (Second) of Torts, including (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests sought to be advanced by the actor; and (d) the proximity or remoteness of the actor's conduct to the interference.[162]  With respect to motive, the Restatement directs an inquiry into "whether the purpose of a defendant's conduct was motivated by a desire to interfere with the contract."[163]  "Only if the defendant's *sole* motive was to interfere with the contract will this factor support a finding of improper interference."[164]

Restatement (Second) of Torts § 772 further refines the tortious interference analysis here by its codification of a so-called "advisor's privilege" that allows an advisor, under certain circumstances, to provide counsel to his client without fear that the advice will give rise to a tortious interference claim.[165]  This section "has

---

[162] *See* RESTATEMENT (SECOND) OF TORTS, § 767 (1979); *see, e.g.*, *WaveDivision Hldgs., LLC v. Highland Capital Mgmt.*, L.P., 49 A.3d 1168, 1174 (Del. 2012) (applying Section 767 factors).

[163] *WaveDivision Hldgs., LLC v. Highland Capital Mgmt. L.P.*, 2011 WL 5314507, at *12 (Del. Super. Ct. Oct. 31, 2011), *as revised* Nov. 2, 2011, *aff'd*, 49 A.3d 1168 (Del. 2012).

[164] *WaveDivision Hldgs., LLC*, 49 A.3d at 1174 (emphasis in original).

[165] RESTATEMENT (SECOND) OF TORTS, § 772(b) (1979) ("[o]ne who intentionally causes a third person not to perform a contract . . . with another does not interfere improperly with the other's contractual relation, by giving the third person . . . (b) honest advice within the scope of a request for the advice.").

been applied to a financial advisor who is thus privileged to interfere with or induce breach of the principal's contracts . . . with third parties, so long as the agent's acts are within the scope of his employment and taken with intent to further the best interests of the principal."[166]

Finally, Restatement (Second) of Torts § 767, cmt. i offers additional guidance.[167] Specifically, the comment recognizes the special relationship that exists between advisor and client and suggests that the advisor should not face tort liability for his client's breach of contract unless the advisor counseled the client in bad faith to breach.[168] This makes perfect sense, of course, given that the advisor's obligations to serve the best interests of the client, at times, may require the advisor to counsel the client to act in a manner that ultimately results in a breach of the client's contract with another. To hold the advisor liable for providing advice that he is justified in providing to the client within the scope of the advisor/client engagement would eviscerate the fourth *prima facie* element of tortious interference

---

[166] 5 J.D. LEE & BARRY A. LINDAHL, MODERN TORT LAW: LIABILITY AND LITIGATION § 45:9 (ed. 2008).

[167] *See* RESTATEMENT (SECOND) OF TORTS § 767, cmt. i ("[I]t is proper for [an advisor] to advise [the contracting party], in good faith and within the scope of [the contracting party]'s request for advice, that it would be to his financial advantage to break his contract. . . .").

[168] *Id.*

with contract.[169]   To avoid that result, and to avoid unnecessary and unwieldy explorations into the causally related consequences of an advisor's counsel to his client, it is proper to require that the plaintiff plead and prove that the advisor actually counseled the client, in bad faith, to breach the contract as a predicate to tortious interference with contract liability.

Here, Plaintiff alleges only that Simmons opined as to the fairness of the Transaction.  While I have concluded it is reasonably conceivable, under the unique facts pled in the TAC, that this conduct aided and abetted EEP GP's breach of contractual *fiduciary duties*,[170] the TAC stops short of alleging that: (1) Simmons' sole motivation in providing its fairness opinion was to interfere with the LPA; (2) Simmons intentionally acted against the best interests of its client; or (3) Simmons actually counseled EEP GP to breach.  Accordingly, Piper Jaffray & Co.'s motion to dismiss Count VIII must be granted.

## I. Remedies

The Supreme Court has determined that, in connection with Section 6.8(a), "Brinckerhoff has pled viable claims that the defendants acted in bad faith when

---

[169] *Irwin & Leighton, Inc.*, 532 A.2d at 992 (plaintiff must prove that the interference was without justification).

[170] To reiterate, there would be no aiding and abetting claim if the LPA did not impose contractual *fiduciary* duties upon the Enbridge defendants.  *Gotham P'rs, LP*, 817 A.2d at 172.

undertaking the [Transaction]."[171] The well-pled facts in the first complaint upon which the Supreme Court rested its decision remain in the TAC and, contrary to Defendants' suggestion, they are not somehow "unpled" by the additional facts pled in the TAC.[172] Nor are Defendants entitled to the presumption of good faith to avoid a damages remedy by relying on Simmons' fairness opinion. As already noted, *Brinckerhoff V* held,

> For several reasons, EEP GP has fallen short of making a dispositive, pleading-stage showing that it is entitled to invoke the conclusive presumption of good faith. By its own terms, Section 6.10(b) requires that EEP GP "reasonably believe" that Simmons was professionally equipped to opine on the fairness and reasonableness of the Alberta Clipper transaction in a manner consistent with the requirements of Section 6.6(e). In this case, whether EEP GP could have reasonably believed Simmons was an appropriate advisor depends on the factual record developed through discovery. For present purposes, we must accept as true Brinckerhoff's allegation that EEP GP could not have reasonably relied on a banker that did not consider what Brinckerhoff has alleged to be the most relevant precedent transaction when it was acting under a standard that expressly required consideration of comparable transactions—the 2009 Alberta Clipper transaction.[173]

---

[171] *Brinckerhoff V*, 159 A.3d at 255. *See also id.* at 258 ("Having established that Brinckerhoff has pled a viable claim for breach of Section 6.6(e) . . . [i]f a breach is eventually found, then under Section 6.8(a), EEP GP is exculpated from monetary damages if it acts in good faith. . . . We find that Brinckerhoff has pled facts supporting an inference that EEP GP acted in bad faith in approving the [Transaction].").

[172] *Brinckerhoff V*, 159 A.3d at 260; TAC ¶¶ 7–9, 19, 25(a)–(c), 160.

[173] *Brinckerhoff V*, 159 A.3d at 261.

As noted, even if EEP GP ultimately is found to have acted in good faith such that it is not liable for monetary damages under the LPA, the Supreme Court has made clear that the LPA does not "limit equitable remedies."[174] "Once liability has been found, and the court's powers shift to the appropriate remedy, the Court of Chancery has broad discretion to craft a remedy to address the wrong."[175] At this stage, I cannot rule out damages, rescission or reformation as possible remedies.[176] Defendants' motion to dismiss Count VI, therefore, must be denied.

## III. CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are **GRANTED in part** and **DENIED in part.** Discovery shall proceed on the following surviving claims: Count I – Derivative Breach of Contract claims against EEP GP, Enbridge Management (and, if amended, against Enbridge and the Director Defendants); Count VI – Equitable Remedies; and Count VII – Aiding and Abetting Breach of

---

[174] *Id.* at 262.

[175] *Id.* Notably, TAC Count VI substantially mirrors Count VIII in the first complaint, which pled reformation or rescission. *Compare* TAC ¶¶ 201–06, *with* First Compl. ¶¶ 169–76.

[176] *See, e.g.*, *In re Loral Space and Commc'ns Inc.*, 2008 WL 4292781, at *33 n.161 (Del. Ch. Sept. 19, 2008) ("[T]his court has broad discretion to remedy breaches of fiduciary duty, including reformation when . . . appropriate to remedy a fiduciary violation.").

47

Contractual Fiduciary Duties against Simmons.  The balance of the claims in the

TAC are dismissed.

**IT IS SO ORDERED.**